# Court of Appeals.

### June 6, 1899.

## PEOPLE v. OSCAR E. RICE.

**1. MURDER—COURT OF APPEALS.**

Section 528 of the Code of Criminal Procedure confers upon the cour of appeals the power, and imposes the duty as well, of reversing a judgment whether any exception shall have been taken or not, where it is satisfied that the verdict is against the weight of evidence or against law, or that justice requires a new trial. Unless the court does reach the conclusion that the verdict was against the weight of evidence or against law, or that justice requires a new trial, it shall not reverse when there is no exception requiring it.

**2. SAME.**

It is not the duty of the court of appeals to grant a new trial because of an alleged error to which no exception was taken upon the trial and which could not have had any influence upon the verdict reached.

**3. SAME—CHARGE.**

The concluding sentence of the charge to the jury on the trial of an indictment for murder in the first degree, that, "If you acquit the defendant you will specify in your verdict that you acquit him on the ground of insanity. If you convict him your verdict will be guilty, as charged in the indictment," does not prevent the jury from finding that the defendant was guilty of murder in the second degree, or any one of the degrees of manslaughter, where, in opening his address to the jury the learned justice carefully and accurately defined murder in the first and second degrees and manslaughter in the first degree.

**4. EVIDENCE—EXPERT.**

> If a man be in reality an expert upon any given subject belonging to the domain of medicine, his opinion may be received by the court, although he has not a license to practice medicine. But such testimony should be received with great caution, and only after the trial court has become fully satisfied that upon the subject as to which the witness is called for the purpose of giving an opinion, he is fully competent to speak.

APPEAL from a judgment of the supreme court, rendered at a trial term for the county of Chautauqna, upon a verdict convicting the defendant of the crime of murder in the first degree.

Arthur B. Ottaway, for appellant.

Eleazer Green and H. C. Kingsbury, for the People.

PARKER, C. J.—Shortly after 3 o'clock in the afternoon of the 25th day of March, 1898, this defendant stabbed his wife, Mary Rice, with a knife, several times, inflicting such wounds that she died immediately after the stabbing was ended. The details of the butchery, for it was nothing else, need not be given, for the killing, and the manner of it, are not in controversy. Several persons saw the defendant stab his wife, and testified to that effect. The evidence introduced tending to show motive was to the effect that the defendant had had difficulty with his wife, which resulted in their living apart from each other, and that he was jealous of a man by the name of Marlowe. A letter that he received from her on the morning of the day of the homicide was introduced in evidence, and reads as follows: "Westfield, N. Y., March 24, '98. Dear Orrie: Your letter received. I can tell you right here that I don't get much time to write, and as for my living in Mayville, I have no use for that town. I have lived in a one-horse town last year, and that is enough for me. You need not rent any house for me. I am all right here. If you can't get work in Jamestown, you certainly cannot do anything in Mayville. You said last summer that you would not live there. Now what are you thinking of ? You had better go and work on a farm if you can't find

anything better; work by the month. I would not live in Mayville, if you would give me a house. I am not coming over there, either. You have said enough last year about my being there. I don't have to go now. If you want to live there you can. Don't trouble about me. I thank you for the ribbon. I cannot wear it. It is too gay; but will tie it on my chair. Give my love to Ad and Gertie. I am going to sell that heater the first chance I have, and settle up with Chapman, and have that done with; then the stove won't get all rust this summer. Where is Horace? Do you hear from him? Write again. With love, from Mate."

For the purpose of establishing that the killing was committed with a deliberate and premeditated design to effect the death of the person killed, the people proved, in addition to certain facts and circumstances, to which reference will be briefly made, conversations with the defendant on the morning of the day of the killing. That the importance of this testimony may be readily appreciated, our attention should first be directed to the geographical situation. Mrs. Rice was at Westfield, serving a family in the capacity of nurse, while the defendant was at Mayville, occasionally at work, the two places being seven miles apart. Samuel T. Hiller testified that on the morning of the day of the homicide the defendant came to him at about half past ten, and said : "'Sam, I came down to bid you good-bye. I may never see you again alive. I am going away. I am going to the city. I have got discouraged living this way, and am on a toot, and I am going to do myself up. You keep that gun, because I have got an easier way.' I asked him if he was going to Buffalo, and he said : 'No, I am going to Oil City. I think it very strange a fellow have a wife, and she won't come to take care of him when he is crippled up as bad as I was when I got hurt at the ice house, and couldn't help myself. * * *'" Ira Honneyset testified : "I saw him between nine and ten o'clock on March 25th. I went into the Mayville House with him, and had a glass of beer. We were in twice that day. Kessel or Huttenbacker waited on us. I saw him again, I think, between eleven and twelve o'clock, near the post office or bank. He told me that he had got tired

of living, and before he would live that way he would go over there and kill his wife and kill himself. We talked some time, and I told him that was a foolish thing for him to do. We went to the Central Hotel to see Mr. Fisher. Mr. Rice went out when I was talking with Mr. Fisher, and came back again, and asked me to go with him, and read a letter. I read the letter to him. It was signed 'Rice.' I don't remember the first name. He said it was from his wife. He said he had just got it then I met him. He said he had been telephoning to her, and hadn't got any answer directly from her." Counsel presents letter to witness. Witness states: "It looks like the same. The contents are the same." The letter that Honneyset testified he read to the defendant, and that was signed "Rice," was the letter that is quoted supra. It was received at the post office at Mayville at nine o'clock that morning, and, according to the testimony of the postmaster, was very shortly afterwards delivered to the defendant, so that the time of delivery corresponds with the testimony of Honneyset as to the time the defendant brought the letter to him to read. An uncle of the defendant by marriage testified that he "met the defendant down by Thomase's store pretty near eleven. I asked him where he was going. He said he was going to Westfield. I asked him what he was going down there for. He said he was going down there to see his wife; to see what she was going to do. I noticed that he was very nervous. He did not keep still. He was on the move all the time. His eyes were glassy. I asked him when he would be back. He said if his wife didn't do something, why, six feet of ground would be all right for him." Thus it was shown that more than five hours before the homicide the defendant told an acquaintance that, unless there was to be a change in their relations, he would kill his wife and take his own life. After that number of hours had passed away, during which the defendant had traveled from Mayville to Westfield, and had had a short interview with his wife, he did to her precisely as he had threatened, and as to himself he made the attempt by cutting his own throat.

It is apparent from the brief reference we have made to the testimony that the jury were fully justified in finding the de-

fendant guilty of murder in the first degree, unless at the time he did not know and understand the nature and quality of the act he was committing, and therefore did not appreciate that he was doing a wrong. This was the defense the learned counsel for the defendant, with great ability, pressed upon the attention of the court and jury throughout the trial. In that direction alone does the evidence introduced on the part of the defendant tend. Relatives and others were called to show epilepsy in the defendant's family, and that his mother was afflicted with the disease during the period of gestation, as well as before and after it. Witnesses were also called who described the defendant's condition on two occasions when he was seized with what they called "fits," and it was claimed for these seizures that they tend ed to show, at least, that epilepsy had at last secured a firm hold upon the defendant. The appearance and actions of the defendant during these seizures, as described by the witnesses who saw him, were subsequently brought to the attention of Dr. Crego, an insanity expert of large experience, who testified that the so-called "fits" were not epileptic seizures, and, further, that the defendant was not a victim of epilepsy. He made a careful examination of the defendant in the presence of Drs. Hazeltine and Schofield, who were in accord with Dr. Crego in the opinion that the defendant was sane. No good purpose can be accomplished by a review of the testimony offered by the defendant in support of his defense that his mental condition at the time of the killing was such that he was not legally responsible for his acts, nor, on the other hand, of the testimony introduced by the district attorney for the purpose of establishing that the defendant was perfectly sane, and full well understood the nature of the act that he committed. It is sufficient to say that the evidence presented a question for the jury to pass upon, and the learned trial justice submitted that question, as he did all others in the case, to them for their consideration, with great clearness and perfect fairness. The result was a finding by the jury that necessarily included within it a determination that the defendant was sane at the time of the homicide, and understood the character of the act he was committing. And that finding was, we think, well supported by the evidence.

We are thus brought to a consideration of two questions which the learned counsel for the defendant presses upon our attention, and which he insists entitle the defendant to a new trial. The first relates to the concluding sentence of the charge to the jury. It reads: "If you acquit the defendant, you will specify in your verdict that you acquit him on the ground of insanity. If you convict him, your verdict will be 'Guilty, as charged in the indictment.'" This charge, it is urged, prevented the jury from finding that the defendant was guilty of murder in the second degree, or any one of the degrees of manslaughter. At the outset of a consideration of this question, attention is directed to the fact that in opening the address to the jury the learned justice carefully and accurately defined murder in the first and second degrees and manslaughter in the first degree. Having discharged his duty in that respect, and put the jury completely in possession of what was necessary to constitute either one of the different kinds of homicide, he took up the questions of fact upon which the jury were entitled to pass, and carefully submitted each question to them, and then, after a full discussion of the question of insanity, it became the duty of the court to instruct the jury that should they find the defendant not guilty on the ground of insanity they should state the fact with their verdict. Code Cr. Proc., § 454. In attempting to make the duty of the jury in that respect clear to them, the court pointed out that the verdict must be very different if the defendant should be found guilty. It said, "If you convict him, your verdict will be, 'Guilty as charged in the indictment.'" This was not intended as an instruction to the jury that they could not convict the defendant of any crime except murder in the first degree, nor do we think that it could have been so understood by the jury. The court had taken too much pains in defining the several degrees of homicide at the opening of the charge to have rendered it possible that the sentence complained of, in the connection in which it was uttered, should have had the effect of persuading the jury that it was the intention of the court to restrain them from finding the defendant guilty of any lesser degree of homicide than that of murder in the first degree. The defendant's counsel

could not have so understood it, or he would have requested the court to correct his charge in that respect or would at least have noted an exception to it. But he did neither, and he now urges that a reversal should be had notwithstanding the absence of an exception. It would seem from an occasional argument of counsel that it is by some of the profession regarded as no longer of importance that an exception should be taken, inasmuch as section 528 of the Code of Criminal Procedure provides : " When the judgment is of death, the court of appeals may order a new trial, if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below." It will be observed that this section confers upon the court the power, and imposes the duty as well, of reversing a judgment, whether any exception shall have been taken or not, where it is satisfied that the verdict is against the weight of evidence or against law, or that justice requires a new trial. It follows, necessarily, that unless the court does reach the conclusion that the verdict was against the weight of evidence or against law, or that justice requires a new trial, it shall not reverse when there is no exception requiring it, and so we have recently held in People v. McDonald, 159 N. Y. ——, 54 N. E. 46. We are not of the opinion that the verdict rendered in this action was against the weight of evidence or against law, or that justice requires a new trial, and therefore it is not our duty to grant a new trial because of an alleged error to which no exception was taken upon the trial, and which could not, we think, have had any influence upon the verdict reached.

The other ground upon which the counsel for defendant bases his claim for a reversal is that the court decided that one Byron Fenner, was not an expert in insanity cases, and refused to permit him to testify as such. It will appear, when we reach the question through an orderly presentation of the facts belonging to it, that the witness did, in effect, answer the question, which the court in the first instance ruled out, against the defendant's objection and exception. Fenner was not a licensed physician, nor was it pretended that he had ever taken a course of lectures

at any medical college, or that he had at any time entered upon a course of study with a view of qualifying himself for entrance into the medical profession. His testimony offered for the purpose of qualifying himself as an expert, and the whole of it, was as follows: " I have resided in Westfield for nearly eighteen years, and did at one time reside in Sherman. I am now a manufacturer of medicines, and publisher of medical books. I am an author of a medical book that is used throughout the United States by druggists and physicians. I have pursued a study of medicine and of nervous diseases in connection with the course of study of medicine. I know the defendant Oscar Rice. I have known him since his birth ; that, is I knew of his birth, and have known him more or less since; I knew his mother. My father was a physician in Sherman, and practiced in Sherman for a great many years. At the time my father was practicing medicine there, I had a drug store in Sherman. I never saw Mrs. Rice have epileptic seizures, but I have compounded medicines upon the prescription of my father for Mrs. Rice for epilepsy." The witness then gave an account of the defendant as he had observed him prior to the homicide and told how afterwards he was called with Dr. Bowers to assist the defendant, and that they dressed the wounds in his throat. The witness described his conduct on these occasions and characterized it as incoherent. Then followed this question " Q. Now, what do you say in reference to his condition there from the time that you were called until he went away, as to his sanity or insanity? Mr. Kingsbury: I object to it. Mr. Green: On the ground you have not qualified him as an expert. The Court: I did not understand the first answer or two whether this man is a regular graduated physician or not. He spoke something about having pursued some studies somewhere. What is there about that ? Mr. Ottoway: He is not a regularly graduated physician. The Court: Then how can he pronounce this opinion as to his sanity or insanity ? Mr. Ottoway: I think he has pursued such a course of study that he is entitled to answer that question. The Court: No, there are plenty of laymen who have pursued studies far beyond men who have license to practice medicine. Simply because a man

has read medicine some does not permit him to testify that way. You may ask the other question the same as you would a layman. Mr. Ottoway : I think I will take an exception." Our attention has not been called to any cases in this state where the court has been called upon to decide whether a person not licensed as a physician could be sworn as a medical expert. The learned authors of Medical Jurisprudence, Forensic Medicine, and Toxicology, say (volume 1, p. 62 ), " The general rule is as stated by Greenleaf in his work on Evidence (section 440) that it is not necessary that the medical expert should have actually practiced his profession." A statement tending in that direction does appear in a note to that section. It reads, " Thus the fact that the witness, though he had studied medicine; was not then a practicing physician, was held merely to go to his credit;" citing Tullis v. Kidd, 12 Ala. 648. The form of the statement indicates that the witness had been legally authorized to practice as a physician, but was not engaged in practice at the time he was called as an expert. After a careful consideration of the subject, we have reached the conclusion that if a man be in reality an expert upon any given subject belonging to the domain of medicine, his opinion may be received by the court, although he has not a license to practice medicine. But such testimony should be received with great caution, and only after the trial court has become fully satisfied that upon the subject as to which the witness is called for the purpose of giving an opinion he is fully competent to speak. The witness Fenner was not prima facie competent, for he had not been licensed to practice medicine. It was essential, therefore, to prove him to be an expert before the defense acquired the right to have him testify as to the sanity or insanity of the defendant. Now, the testimony adduced, as we have observed, is that Fenner was a manufacturer of medicines, and the publisher of medical books, and the author of a medical book used throughout the United States by practicing physicians, the subject of which is not given, and therefore presumably not relating to insanity, and that he had " pursued a study of medicine and of nervous diseases in connection with the course of study of medicine." Whether he had pursued this study one week or

one year does not appear ; or whether he had ever read an article on the subject of insanity let alone studied the subject, does not appear. It is clear, therefore, that the trial court was right in refusing to permit Fenner to give his testimony as an expert on the subject of insanity. If he was an expert, that fact had not been shown when the court refused his opinion evidence. It is probable the fact could not have been shown. A little later the witness testified to matters without objection, which substantially constituted an answer to the question. Indeed, the answer is so fully given that, had we reached the conclusion that Fenner qualified himself as an expert, we might have felt obliged to hold that the error had been cured. The judgment of conviction should be affirmed.

All concur. Judgment affirmed.