# CASES DETERMINED

# January Term, 1902.

---

ALLEN, Respondent, vs. VOJE, Appellant.

*March 11—April 1, 1902.*

*Physicians and surgeons: Malpractice: Negligence: "Order": "Judgment": Change of venue: Waiver: Witnesses: Medical experts: Qualifications: Hypothetical questions: Examination of witnesses: Objections: Practice: Court and jury: Prejudicial error: Husband and wife: Agency: Abuse of discretion: Proximate cause: Instructions to jury: Excessive damages.*

1. An order or judgment is the decision of the court, formulated in writing by the judge, or declared by him orally; in the latter event the duty rests upon the clerk to write out the substance upon his records, in which case it becomes entered as completely as if written out by the judge himself and signed by him.

2. Where an order or judgment is reduced to writing, the writing is, at most, but the evidence of the decision in fact made.

3. Where the place of trial of the action was changed, and the records of the circuit court disclosed that in open court the affidavit and motion for such change were presented and "the change of venue ordered to the county court," it was *held* that there had been a complete compliance with sec. 2625, Stats. 1898, commanding that upon the affidavit and motion "the court shall change the place of trial," and "an order for a change of the place of trial shall be entered."

4. Under sec. 2628, Stats. 1898, providing that "after the place of trial . . . shall have been changed and a trial had in the county to which the change was made, the proceedings or order for such change shall be conclusive, except as against such ob-

jection as shall have been filed in writing upon a motion to remand before such trial was entered upon," an objection to the change cannot be made for the first time in the supreme court on appeal. The statute is intended to cure all defects, and to impose a conclusive presumption of waiver of all objection, and of consent to the change, unless objection be made in writing before entering upon the trial.

5. Witnesses, qualifying as medical experts, testified that they had licenses from the state medical board, and one of them further testified that he was a graduate, holding a diploma from a regularly incorporated medical college, at a time when that alone would suffice to qualify him to testify. *Held*, that the witnesses were qualified, although their licenses were not recorded in the counties where they were practicing, as required by sec. 4, ch. 87, Laws of 1899; exclusion from testifying as experts is not prescribed as a penalty for failure to record their licenses, either by said ch. 87, or by sec. 1436, Stats. 1898, limiting the right or privilege to those holding such license or diploma.

6. The testimony of a witness, qualifying as a medical expert, that he was "a physician and surgeon duly licensed to practice in this state," in the absence of any evidence controverting it, or any cross-examination, is *held* to mean that he had received such a license.

7. Where, on objection being made to a hypothetical question, the examining attorney invites suggestions as to any inaccuracy of statement, or any fact omitted, and offers to make correction, which invitation is declined, such conduct ordinarily precludes counsel from thereafter predicating error upon inaccuracies of the question.

8. In the make-up of a bill of exceptions, it appeared that a medical expert, who had been examined upon a hypothetical state of facts and expressed his opinion, closed his answer to an objected question by saying, "It should have been done." Some lines further on, after speaking of other subjects, he was made to say, in testimony written out in narrative form, "I think, beyond a doubt, the evidence points to" the condition at issue. *Held*, that such conclusion could not have been given in response to the objected question, but in response to another question not preserved in the record, and to which no objection appeared to have been made.

9. In such case, the question would not be erroneous unless the answer was responsive to the question, and if non-responsive, counsel, in order to save an objection, should move to strike it out.

10. In an action for malpractice, physicians, residing in a near-by city, were permitted, against objection, to answer a question whether, in their opinion, certain treatment was proper, and "sanctioned" by physicians and surgeons possessing and exercising ordinary skill and intelligence in the vicinity of the place where the treatment was given. *Held*, that such inquiry was proper as calling for a conclusion whether the specified treatment was in accord with the methods adopted by such physicians generally, and was not open to an objection that it called upon third persons to testify as to the opinions of others.

11. In such case it appeared that the witnesses lived thirty miles from the place where the treatment was given, and qualified themselves to speak on the subject by testifying that they were familiar with the practice of medicine and customs of the profession in the latter place. *Held*, that no error was committed in permitting such inquiries to be made.

12. In such case it is not prejudicial error to permit a physician to answer a question: "What conditions were necessary to a *thoroughly and completely aseptic* surgical operation?" where the witness's description of the required conditions did not go as far as the precautions which the testimony showed were taken, and which, it was substantially conceded, were necessary.

13. In such action it appeared that plaintiff had requested her husband to go to defendant, a physician, and make certain inquiries as to the significance of her symptoms, and necessary treatment therefor. In testifying to his conversation with the defendant, he was asked: "Did he (the defendant) state what the operation would be? What operation was it he meant, if you know?" *Held*, that such questions clearly called for a part of a transaction within the field of the agency of the witness.

14. It is not an abuse of discretion for the trial court to refuse to allow a trained nurse, attempting to testify as a medical expert, to answer questions calling for an opinion on a strictly medical subject, especially where it is apparent to the court that the party calling for such opinion is supplied with numerous experts, thoroughly qualified, who were permitted to testify on the subject.

15. Whether the purpose of sec. 1436, Stats. 1898 (prohibiting physicians from testifying as experts unless their qualifications be established by diploma or license as therein defined), is to confine all expert testimony upon medical subjects to persons having the statutory qualifications, or whether it is merely a

restriction upon practicing physicians and surgeons, intended to induce them to comply with the statutory requirements with reference to license, not determined.]

16. If there is credible evidence, however it may be contradicted, a question of fact arises to be passed upon by the jury.

17. In an action for malpractice, where the injury consisted in localization of pus following an operation by curettement, and necessitating the subsequent removal of plaintiff's ovary, neither a finding as to proximate cause, nor instructions thereon, are necessary. The defendant's duty to reasonably anticipate injury from the negligent conduct of such an operation, and the probability of injury, are apparent, as a matter of law.

18. In an action for malpractice, an excerpt from an instruction—that "a departure from approved methods in general use, if it injures the patient, will render him (the physician) liable, however good his intentions may have been"—is not erroneous, where the court has, by the rest of the charge, excluded the idea of liability for variations from customary practice merely in the way of increased precautions, recognized as such.

19. In such action an instruction, that if defendant did not follow such established practice as is "recognized, adopted, and followed by all physicians and surgeons in good standing," etc., it would be negligence, cannot be construed to require defendant to have and exercise the skill of all physicians residing in his neighborhood, but declares that he is liable only in case he omits a practice which was recognized and adopted by all.

20. In an action for malpractice, where the injury resulted in much suffering, and necessitated a difficult operation—the removal of one of plaintiff's ovaries—resulting in impairment of health and genital functions, a verdict for $3,000 is not excessive.

APPEAL from a judgment of the county court of Waukesha county: M. S. GRISWOLD, Judge. *Affirmed.*

The plaintiff, then about thirty-five years of age, having been long a sufferer from uterine trouble, which, however, did not incapacitate her from doing the ordinary work of a farmer's wife, went for treatment to the defendant, who maintained at Oconomowoc a sanitarium for the treatment of chronic diseases of various sorts. Remaining in his sanitarium for about four weeks for general treatment, she returned to her home for a similar period, under the care of her family

physician, and shortly before July 30, 1899, returned to defendant's sanitarium. He made examination, and found suppurating, inflammatory condition of the interior of the uterus, and considerable other inflammation throughout the pelvic region. Plaintiff complains that on this occasion she was placed in a basement room, dark, damp, and uncomfortable, containing charts and casts displaying various parts of the human body, which distressed her greatly, and against which she protested. After a day or two of preparation, there was performed on her the operation of curettement, consisting of the scraping of the internal membrane of the uterus. She offers testimony that this operation was performed under highly improper circumstances, in the same room inhabited by herself and another patient, which was dirty, contained the clothes of the inmates, and had various characteristics making infection probable. After the operation, plaintiff offers evidence that she suffered great inflammation and pain, accompanied by sickness at the stomach, and that she was left without any proper attendance or care, being obliged, notwithstanding her weakness and the great pain occasioned thereby, to care for herself when sick at the stomach; that the matter thrown up was allowed to remain hours, and that the fecal matter from her bowels was allowed to remain uncovered for a long time in the room; that all of these things caused her great distress, mental and physical, besides retarding her recovery. She further claims and offered evidence to show: That, immediately following the operation of curettement, there developed general inflammation and bloat throughout the pelvic region. That extreme pain developed in the region of the right ovary, which previously had been free from pain or indication of trouble,—and relates symptoms which certain of the physicians testified indicated the development of a localization of pus in the right ovary. As the bloated condition diminished, a lump, characterized by severe pain, became perceptible in the right ovarian region, and persisted, in-

creasing somewhat in size. That defendant's attention was repeatedly called to it, but that he gave it no attention or treatment. That she remained under his hands some ten weeks, becoming more and more run down, and then returned to her home, where, after almost reaching death's door, and the lump before referred to having attained proportions of five or six inches in diameter, it was diagnosed as a tubo-ovarian abscess, and had to be operated upon, resulting in the removal of the right ovary and Fallopian tube, which were found to be filled with pus.

The principal claims are: First. That the condition of the room and lack of attention caused plaintiff great temporary discomfort and damage. Secondly. That the plaintiff's condition was such that the operation of curettement was improper; that an ordinarily careful physician would not have subjected her to it, but would have anticipated those injuries which did result, namely, infection of other parts of the body, especially of the ovaries; and that the result of such improper operation was the infection of other parts of plaintiff's body, the formation and localization of pus in the right ovary, the consequent long-continued pain, suffering, and difficult operation, and ultimate loss of the ovary, with the impairment of plaintiff's health and of her genital function. Thirdly. That the operation of curettement was accompanied by neglect of ordinary precautions to render it aseptic and to guard against infection from the outside, whereby naturally resulted the subsequent conditions. Fourthly. That it was neglect, after the symptoms with reference to the bunch in the right ovarian region were brought to the defendant's attention, not to diagnose the same as a gathering of pus and to remove it; thus saving the plaintiff months of suffering and the greatly exaggerated operation later.

Substantially all of these contentions of negligence were controverted by evidence offered by the defendant. The court overruled motions by the defendant for nonsuit and for the

direction of a verdict, and submitted the case to the jury upon three questions, which, with their answers, were as follows:

"1. Was the defendant in this action, in the course of his treatment of the plaintiff from May 29 to October 10, 1899, guilty of negligence? A. Yes. 2. If you answer the first question, 'Yes,' did the plaintiff sustain injury in consequence of such negligence? A. Yes. 3. If you answer both of the preceding questions, 'Yes,' at what sum do you assess the plaintiff's damages for such injury? A. Three thousand dollars."

Defendant moved to set aside the verdict and for new trial because the damages were excessive, because the evidence did not support the several answers, because of admission of improper evidence, and because of errors in the charge, which motion was overruled, and judgment entered for the plaintiff for the amount found by the jury, from which defendant appeals.

*George E. Robinson,* attorney, and *T. E. Ryan,* of counsel, for the appellant.

*Paul D. Durant* and *John F. Burke,* for the respondent.

Dodge, J. Numerous specific assignments of error are alleged and argued. They will be considered in the order of their presentation.

1. The contention of appellant that error was committed in refusing to remand the present case to the circuit court after the trial had been completed and the verdict rendered is wholly untenable. It is predicated alone upon the fact that no written order directing the change from circuit to county court was signed by the judge. The records of the circuit court disclose that in open court the affidavit and motion for such change were presented, and "change of venue ordered to the county court August 28th." This was a complete compliance with sec. 2625, Stats. 1898, which commands that upon the affidavit and motion "the court shall change the place of trial," and after waiting, in his discretion, to secure

another judge, on the last day of the term "an order for a change of the place of trial shall be entered." An order or judgment is the decision of the court. It may be formulated in writing by the judge, or declared by him orally. In the latter event the duty rests upon the clerk to write the substance upon his records. That was done in this case, and thereupon the order became entered as completely as if written out by the judge himself and signed by him. *Baker v. Baker,* 51 Wis. 538, 8 N. W. 289; *Harris v. Snyder,* 113 Wis. 451, 89 N. W. 660. The writing is, at most, the evidence of the decision in fact rendered. *Findlay v. Knickerbocker I. Co.* 104 Wis. 375, 378, 80 N. W. 136. Another answer to appellant's contention consists in the fact that he did not make his objection in time. Sec. 2628, Stats. 1898, provides:

"After the place of trial . . . shall have been changed and a trial had in the county to which the change was made, the proceedings or order for such change shall be conclusive except as against such objections as shall have been filed in writing upon a motion to remand before such trial was entered upon."

This statute is obviously intended to cure all defects, and to impose upon a party conclusive presumption of waiver of all objection, and consent to the change, unless he objects in writing before entering upon the trial.

2. We hardly understand the objection to the competency of Drs. Goette and Peck as medical experts. They both testified that they held licenses from the state medical board; and, further, Dr. Goette testified that he was a graduate holding a diploma from a regularly incorporated medical college at a time when that alone would suffice to qualify him to testify. True, the language of Dr. Peck's testimony as to his qualification was, "I am a physician and surgeon duly licensed to practice in this state." It perhaps contains an element of conclusion, but in the absence of anything controverting it,

·or any cross-examination, it must be understood to mean that
he has received a license.. It is suggested that sec. 4, ch. 87,
Laws of 1899, requires physicians holding licenses to procure
them to be recorded in the counties where they are to practice;
but the only penalty for a failure so to do is prescribed by the
same act, and is not an exclusion from the privilege of testi-
fying as experts. That right or privilege. is limited only by
sec. 1436, Stats. 1898, which contains no such requirement.
*Schaeffer v. State,* 113 Wis. 595, 89 N. W. 481.

3. Complaint is made of a very extended hypothetical
question which was propounded to substantially all of the
plaintiff's medical experts. The objections to it now urged
are that it contained the statement that on the 5th, 6th, and
7th days after curettement, plaintiff's temperature rose to
102.6, and that during the same period she suffered severe
pains in the region of her right ovary. It is insisted that
this was not in accordance with the evidence, and therefore
was misleading to the jury, and rendered the question im-
proper. We find the head nurse, Mrs. Green, testified that at
this time "her temperature was 102, and I think 102.6"; and
the defendant himself, in his direct examination, speaks of
that as the maximum attained during this period. We also
find that the plaintiff repeatedly testified that during this
period she suffered extreme pain in the region of her ovaries
and on the right side. So both of these elements of the ob-
jected question had support in the evidence. Whether there
are other inaccuracies, either of commission or omission, in
this extended hypothetical question, it is not the duty of the
court to investigate and ascertain., Those that the appellant
points out do not exist. The appellant hardly stands in any
position to complain of this question, in any event. When he
made the objection thereto upon the trial, the plaintiff's attor-
ney invited him to suggest any inaccurate statement contained
therein, or any proper fact omitted, offering to make due cor-
rection. This the defendant's attorney refused to do. Such

conduct should ordinarily preclude counsel from thereafter predicating error upon a hypothetical question on the grounds now urged. *Cornell v. State,* 104 Wis. 527, 535, 80 N. W. 745; *Davey v. Janesville,* 111 Wis. 628, 633, 87 N. W. 813.

A further objection is somewhat indefinitely made, that certain experts were called on to pass upon the credibility of evidence. We have carefully examined the testimony complained of, and find no support for the objection. In every case, either the question is free from that objection, or the counsel is urging our attention to testimony related in narrative, which obviously was never given in response to the printed and objected question. Thus, of Dr. Madden it was asked if it was proper practice to allow the patient to leave the sanitarium or hospital, and go to her home, without informing her or her relatives of the true condition of the localized pus or abscess. This was after he had been examined upon a hypothetical state of facts, and had expressed the opinion that there was such localized pus. Obviously, the question is open to no other construction than that of referring to the situation as to which he had already testified. He completed his answer to that question by saying, "It should have been done." Some lines further on, after speaking of other subjects, he is made to say, in narrative, "I think, beyond a doubt, the evidence points to an abscess." It is absurd for appellant to urge to judges who have themselves participated in trials, and in the make-up of bills of exceptions, that this statement was given in response to the objected question. If it was, it was not responsive, and would not make the question erroneous; and counsel, if he would save an objection thereto, must have moved to strike it out, which he did not do. The objected question to Dr. Brown, as to how long it would require for the abscess to attain a certain size, is expressly predicated upon a hypothetical statement of facts, and the physician's answer is, "From five to eight or ten weeks, perhaps." This completes the whole answer responsive to that

question, and in narrative form the witness then states that he thinks the foregoing facts show the existence of pus in the patient's right ovarian region. Of course, this was in response to another question, to which no objection appears to have been made. Other questions to Dr. Brown, and his answers, which were argued at some length, present the same situation. The objected question is unobjectionable, and testimony which is selected for criticism was in no wise responsive to such question, was obviously given in response to other questions, and, in any event, not being responsive, could not make the question bad, even if it is obnoxious to a motion to strike out, which counsel did not make.

Further assignments of error are predicated upon the permitting of Milwaukee physicians to testify in response to a question whether, in their opinion, certain treatment was proper and "sanctioned" by physicians and surgeons possessing and exercising ordinary skill and intelligence in the vicinity of Oconomowoc. It is claimed, first, that this is calling upon third persons to testify as to the opinion of others. We do not so regard it. It was no more than a method of expressing the inquiry whether the specified treatment was in accord with the methods adopted by such physicians generally. Nor do we discover any force to the second objection,— that Milwaukee physicians should not have been allowed to testify with reference to proper practice in the vicinity of Oconomowoc. The two places are but about thirty miles apart, and the physicians qualified themselves to speak on the subject by testifying that they were familiar with the practice of medicine and customs of the profession in the vicinity of Oconomowoc. We think no error existed in permitting these inquiries to be made. Further complaint is made of the inquiry to Dr. Brown, "What conditions were necessary to a thoroughly and completely aseptic surgical operation?" While, of course, the appellant's counsel is correct in the proposition that defendant was not required to have condi-

tions insuring a "thoroughly and completely aseptic" surgical operation, unless such conditions were customarily secured by ordinarily careful physicians and surgeons, yet an explanation to the jury of what those characteristics were, we think, was harmless in this case, because Dr. Brown, in his description of them, went no further than (indeed, not so far as) the precautions which the defendant and his witnesses testified that they took, and substantially conceded were necessary to a proper operation,—indeed, such as the chief nurse testified were commonly taken.

4. Error is assigned because the plaintiff's husband was permitted to testify to matter which the appellant contends was not within any agency. It having appeared that his wife had requested him to go to the defendant and make certain inquiries as to the significance of her symptoms, and necessary treatment therefor, he proceeded to testify as to his conversation with the defendant. The only objected question was: "Did he [the defendant] state what the operation would be? What operation was it he meant, if you know?" This clearly called for a part of the transaction between the witness and the defendant, wherein the former was acting at the request and on behalf of the plaintiff, to ascertain facts needed by her for her guidance and treatment. This is clearly within the field of agency. He was acting in her behalf. Here, again, appellant's counsel indulges in criticism upon two or three pages of testimony having no relevancy to that question, and which was, of course, given in response to many others. If that testimony was improper, counsel should have made his objection in the trial court, and not waited till he reached this.

5. The seventh assignment of error arises thus: A witness having testified that she was a trained nurse and had had many years' experience, and having testified with reference to the plaintiff's symptoms, including the temperature of 102, and that she did not at any time notice any dangerous symp-

toms, but that 104 degrees of temperature would be an alarming temperature, the question was put, "Is 102 alarming?" an objection to which was overruled, and she permitted to testify that "102 is indicative of some trouble; 104, that the patient was in a critical condition." Whereupon she was asked, "Does the record or chart kept of the condition of *Mrs. Allen* show any dangerous condition of the patient, so far as the temperature is concerned?" Also, "Is 102.4, or is it not, a symptom of alarming danger?" Objections to both these questions were sustained. The questions clearly called for an opinion upon a strictly medical subject, and if it be conceded that proof of considerable experience as a trained nurse might qualify one as an expert to give opinion thereon, as to which authorities are in some conflict (*Mason v. Fuller,* 45 Vt. 29, and *Dashiell v. Griffith,* 84 Md. 363, 35 Atl. 1094), an interesting question is suggested, as to the force of the statute (sec. 1436, Stats. 1898) in terms prohibiting practicing physicians from testifying as experts unless their qualifications be established by diploma or license as therein defined. Whether the purpose of this statute is to confine all expert testimony upon medical subjects to persons having the statutory qualifications, or whether it is merely a restriction upon practicing physicians and surgeons, intended to induce them to comply with the statutory requirement with reference to license, is a subject upon which there might be debate. The latter view derives some support from *People v. Rice,* 159 N. Y. 400, 54 N. E. 48. The question, however, is not discussed by counsel on either side; and, as it is of much importance, we do not feel justified in undertaking an investigation and decision of it without argument, unless essential to the decision of the cause, which we think is not the case. The utility and safety of expert evidence, as well as the sufficient qualification of the expert, are subjects over which trial courts have very broad discretion. *People v. Rice, supra; Dashiell v. Griffith,* 84 Md. 378, 35 Atl. 1094; and *Cornell v. State,*

104 Wis. 537, 80 N. W. 745. This particular witness had been permitted to answer questions almost identical with those which were excluded, and, in addition, the fact was apparent to the court that defendant was supplied with numerous thoroughly qualified expert witnesses, including himself,—physicians especially fit to speak upon a subject of medical knowledge, experience, and opinion, and much more likely to be safe guides to the court and jury than would any witness not having those qualifications, and whom he did permit to testify on this subject. In that situation, we do not doubt that it was within the wise discretion to be exercised by trial courts to refuse to permit this witness to testify further on the subject, and that no error was committed.

6. The eighth assignment of error brings up the denial of motion for nonsuit, motion to direct a verdict for the defendant, and motion to set aside the verdict and grant a new trial. Of course, the rule that if there is any credible evidence, however it may be contradicted by that of the defense, a question of fact arises to be passed on by the jury, is too trite to need more than statement. The principal claims of malpractice are set forth in the statement of facts, and we have no doubt, from a careful inspection of the record, that there is evidence to support each of those three claims, whatever might be our view as to the preponderance of evidence for or against either of them. With reference to the first, the plaintiff and her roommate, Mrs. Riebe, testify with entire positiveness to the unfitness of the room for care and treatment of a woman in plaintiff's condition, and of her neglect by nurses, whereby, while suffering excruciating pains, greatly enhanced by any movement, and while suffering from extreme nausea, she was left without attendance, and required to raise herself and to vomit over the side of the bed, without any receptacle, and that the matter thus ejected was left for hours before being cleaned up; that fecal matter was left standing in open vessels in close proximity to her bed for long periods of time;

and that the conditions of the room at the time of the curette-
ment were such that all the physicians, including the defend-
ant himself, declared their unfitness for such an operation,
and the extreme peril of infection in the process thereof.
True, the defendant and certain of his nurses contradict more
or less completely all of these statements, and it might reason-
ably be argued to a jury that, as to some of those relating to
the nonaseptic conditions, neither the plaintiff nor Mrs.
Riebe were in position to know positively; but as to other
of those conditions the testimony is in irreconcilable conflict,
and certainly justified the submission to the jury of the ques-
tion both as to the condition of the room and neglect of
plaintiff by nurses, to her physical and mental suffering while
there confined, and also with reference to the neglect of pre-
cautions against infection during the operation upon her.

On the second question—as to whether defendant departed
from recognized and established methods of treatment in per-
forming the operation of curettement at all, in view of the
diseased condition of surrounding organs and tissues, which,
by the way, is the most important of his alleged malpractices,
in possible results—there is the testimony of two or three of
the physicians, notably Dr. Henrotin, called by the defend-
ant, first, that such operation is frequently proper "when
there are no symptoms of pelvic inflammation outside of the
uterus," carrying clearly the implication of impropriety when
such symptoms do exist. He also testifies:

"Curettement is frequently the means of doing harm, as
well as great benefit. The harm is that septic infections sur-
rounding previously healthy tissue is frequently made pos-
sible by the curettement opening up new avenues of infection,
. . .   most likely to manifest itself in the Fallopian tubes,
—particularly in the ovaries."

Dr. Brown testifies:

"The operation of curettement is not proper for the clean-
ing and scraping of the womb if there was inflammation of

the tissues. " If that infection is located otherwise, there is all the more reason for not operating. If the history of the patient shows that there had been infection for seven or eight years, or symptoms of it, I would have left it alone; I would have operated for the removal of the infection. I would judge from the hypothesis given that infection had taken place in the left side, in the region of the ovary, prior to entrance to the hospital. Under those conditions I would have operated for the removal of the infection before I curetted."

Other physicians suggested the same view. We cannot avoid the conviction that the question was an open one for the jury whether it was not failure to exercise proper skill and the judgment ordinarily exercised, in deciding to make the operation of curettement at all at the time, and under the physical conditions existing when it was made, as well as under the surrounding nonaseptic conditions to which plaintiff and Mrs. Riebe testify.

The third element of complaint was failure to diagnose the existence of localized pus in the right ovary at an early date after the curettement, and to remove the same, instead of allowing the gathering to continue for some ten weeks, and allowing the patient to return to her home without instruction as to the existence of such pus and the necessity for its removal. The evidence is quite abundant, not to say preponderant, that, from the symptoms disclosed, an ordinarily skilful and careful physician would have diagnosed a localized gathering of pus within a couple of weeks after the curettement; and, with few exceptions, the medical witnesses testify that due care required an operation to remove it by incision and drainage as soon as its existence was discovered. True, there is testimony that palliative treatment might be permissible practice, but this has no more effect than to raise the question of fact for decision by the jury. We therefore conclude that the court would not have been justified in ordering either nonsuit or verdict for the defendant, and that the exer-

cise of his discretion against the granting of a new trial was not an abuse thereof.

7. The ninth and eleventh assignments of error complain that the element of proximate causation connecting defendant's alleged negligence and plaintiff's injuries was not found by the jury, either expressly by answer to direct question, or impliedly by reason of any instruction making it a prerequisite to affirmative answer to either the first or second question. The fact is as claimed. Instructions went no further than the questions themselves; that is, simply to submit the fact of negligence in the respects stated, and the fact of actual causation of injury. The importance, ordinarily, in negligence cases, of a finding by the jury upon the question of proximate causation as a fact, under proper instruction from the court as to the law, has been so recently discussed and enforced that there is no occasion to enlarge upon the subject again. *Sheridan v. Bigelow,* 93 Wis. 426, 67 N. W. 732; *Deisenrieter v. Kraus-Merkel M. Co.* 97 Wis. 279, 72 N. W. 735; *Maitland v. Gilbert P. Co.* 97 Wis. 476, 72 N. W. 1124; *Groth v. Thomann,* 110 Wis. 488, 86 N. W. 178. The rule is without exception that liability in damages for acts or conduct lacking in ordinary care cannot arise unless the act be such that an ordinarily careful person would anticipate that some injury to another might probably result therefrom. Indeed, that circumstance is an essential element of actionable negligence. With mere carelessness the law has no concern, unless it be such that some injury may be reasonably anticipated. But the rule that the question of fact must be passed upon by the jury is not without exception. In all of the cases above cited, such an exception is noted when the fact appears by necessary inference from the facts found, or from undisputed evidence. *Maitland v. Gilbert P. Co.* 97 Wis. 476, 487, 72 N. W. 1124. In line with this exception, in *Crouse v. C. & N. W. R. Co.* 102 Wis. 196, 203, 78 N. W.

446, 448, where the negligence consisted in constructing and maintaining a bridge found by the jury to be unsafe, it was remarked:

"When a train plunges through an unsafe bridge, there is little room to speculate on proximate cause. If the bridge was negligently and unsafely constructed, the destruction of a train and the loss of human life thereon must necessarily be contemplated by any reasonable man who built it. He cannot say that he did not anticipate an accident. Such a claim would be puerile. As well might a municipal corporation which has left an open pit in a street defend on the ground that it could not anticipate that a traveler would fall into it."

And that view was reaffirmed upon the second appearance of the same case in this court. 104 Wis. 473, 478, 80 N. W. 752. In *Evansville & T. H. R. Co. v. Carvener,* 113 Ind. 51, 53, 14 N. E. 738, 740, the court said:

"A defendant who, in violation of an express statutory duty, places or causes an obstruction in a public highway, will not be heard to say that he did not anticipate an injury which was the direct result of his unlawful act."

A very marked case of an unavoidable inference from the known facts that the element of proximate causation existed between the act of negligence and the injury is *Seaver v. Union,* 113 Wis. 322, 89 N. W. 163, where the plaintiff, either with knowledge of the approach of another team, or by negligent omission to inform himself of its approach, entered into a place in the highway where two teams could not pass each other without peril of injury, and, in turning out and returning to the highway, was capsized and injured. The court held that the relation of proximate cause between his negligence in entering into this space and the injury must be inferred by the court. It is not essential to the existence of actionable negligence, or of liability therefor, that a reasonably prudent person would have foreseen the exact injury which did result. It suffices that some injury to some person

might reasonably have been foreseen as likely to occur. 1 Shearm. & Redf. Neg. § 21. Viewing the present case in the light of the rules of law thus established, we are convinced that there is no room for difference of opinion as to whether, from the lack of skill, care, and precautions ordinarily exercised by physicians in treating or operating upon the highly sensitive portions of the feminine anatomy involved in the treatment in this case, an injury must be anticipated as likely to occur. To hold otherwise would involve a contradiction in ideas. It is the very peril of physical injury which necessitates a code of precautions in diagnosis and treatment by physicians and surgeons. They serve no other purpose. Taking for illustration the precautions to render an operation aseptic, such as described by the defendant himself, it is apparent and undisputed that they are adopted for no other reason than that every physician anticipates injury to the patient as probable in their absence. The whole field of discussion by the medical witnesses as to whether certain acts were or were not proper turned upon whether an ordinarily skilful and prudent surgeon would have anticipated injury therefrom. It is unreasonable to say that a physician may improperly and negligently excoriate the lining of a delicate internal organ, and escape liability by doubt as to whether he, in the exercise of reasonable care, should have anticipated injury to the patient thereby. The relationship between such an act of the physician and the physical condition of the patient is so intimate that he must necessarily anticipate some physical effect as the result of such operation, and, of course, that such effect will be bad if his act be improper or improperly done. The view above expressed is confirmed by the fact that in no decided case cited by counsel or found by us, nor in any textbook, is declared the necessity of any finding of this element of anticipation of injury from professional negligence in medical treatment or surgical operations. Uniformly, liability is made to depend on whether injury in fact resulted

from departure from recognized methods or omission of usual precautions. This seems to be true, also, of the cases decided by this court. Thus, in *Gates v. Fleischer,* 67 Wis. 504, 30 N. W. 674, the jury were instructed:

"If the defendant did not serve the plaintiff with the skill, prudence, care, and judgment before mentioned, and the plaintiff, without fault on her part which contributed thereto, was damaged by reason of defendant's said failure, she is entitled to recover for the damages sustained by her, and thus occasioned."

The same idea was reiterated more than once in the charge, which was declared by this court to be unexceptionable, although it is true that the necessity for anticipation of injury was not discussed. Again, in the very recent case of *Kiekhoefer v. Hidershide,* 113 Wis. 280, 89 N. W. 189, while the court defined "proximate cause" as including the idea of probability, yet he instructed the jury:

"In order to entitle the plaintiff to recover in this case, you must find the injury, or some of them, for which she now seeks to recover, was the proximate cause of such negligence [*sic*]; that is, Was such negligence, if you find there was negligence, the efficient or producing cause?"

The judgment in this case also was affirmed, though without discussion of the subject now in hand. The situation in the present case is clearly distinguishable from such as the *Maitland Case,* 97 Wis. 476, 72 N. W. 1124, where an incompetent employee improperly cut off steam and caused an explosion of a gauge, or the *Deisenrieter Case,* 97 Wis. 279, 72 N. W. 735, where, for the first time in the history of a brewery, gases escaped from one room into another, where plaintiff happened to be temporarily working, in sufficient quantity to injure him. In each of those cases reasonable minds might well differ as to the probability of any injury resulting from the negligent act. It does not seem to us that they can as to the probability of some injury from such im-

proper or negligent surgical operation and treatment as that presented in this case; hence a finding of the jury thereon was not necessary in this action, though it is not impossible that cases of malpractice might be presented wherein the proximate causation of injury should be passed on by the jury.

8. The tenth assignment of error is predicated upon certain instructions to the jury. The charge, while perhaps more prolix and containing more of repetition than was necessary or helpful to the jury, is, in the main, in general accordance with the rules of law as to the measure of duty and liability of a physician. While several exceptions were reserved, the appellant assigns and argues as error only two of these, except as to the question of proximate cause, already discussed. We shall therefore confine our consideration to those specific criticisms. The asserted vice in the first of these appears most strongly in the following quotation:

"A departure from approved methods in general use, if it injures the patient, will render him [the physician] liable, however good his intentions may have been."

This is criticised because it makes the physician liable in case he adopts new methods, although improved ones, and counsel suggest that no progress in medicine is possible if physicians must adhere to ancient methods; that vaccination or the use of anti-toxin, however wise and generally helpful, would, under that doctrine, have been malpractice originally. The instruction, viewed in the light of the rest of the charge, of course excludes the idea of liability for variations from customary practice merely in the way of increased precautions, recognized as such. Its only application, in the light of the evidence, must have been to the omission of precautions such as it was testified other physicians uniformly took, or in the deviation from such practice by making an operation of curettement under the circumstances presented. The argument made by counsel was met by the supreme court of

New York in *Carpenter v. Blake,* 60 Barb. 488, 523, with this remark:

"Some standard by which to determine the propriety of treatment must be adopted; otherwise experiments will take the place of skill, and the reckless experimentalists the place of the educated, experienced practitioner. . . . But when the case is one as to which a system of treatment has been followed for a long time, there should be no departure from it, unless the surgeon who does it is prepared to take the risk of establishing by his success the propriety and safety of his experiment. The rule protects the community against reckless experiments, while it admits the adoption of new remedies and modes of treatment only when their benefits have been demonstrated, or when, from the necessity of the case, the surgeon or physician must be left to the exercise of his own skill and experience."

This view has received support in other cases (*Slater v. Baker,* 2 Wils. 359; *Jackson v. Burnham,* 20 Colo. 532, 39 Pac. 577; *Patten v. Wiggin,* 51 Me. 594), and, we think, is substantially approved by this court in *Nelson v. Harrington,* 72 Wis. 591, 604, 40 N. W. 228, 233, where it was held that a so-called clairvoyant physician, pursuing peculiar methods of diagnosis and treatment, must be held to take the risk thereof. It was said:

"One who holds himself out as a medical expert, and accepts employment as a healer of disease, but who relies exclusively for diagnosis and remedies upon some occult influence exerted upon him, or some mental intuition received by him when in an abnormal condition, in like manner takes the risk of the quality or accuracy of such influence or intuition."

We think the rule laid down by the court is supported by the weight of authority in cases where there can be said to be a thoroughly established and usual method of treating a situation. We have little doubt that, if the first case of vaccination had proved disastrous and injured the patient, the physician should have been held liable. Nor do we believe that a physician of standing and loyalty to his patients will subject

them to mere experiment, the safety or virtue of which has not been established by experience of the profession, save possibly when the patient is *in extremis* and fatal results substantially certain unless the experiment may succeed.

The further error assigned upon the charge is predicated upon a sentence or two used in pursuance of the preceding idea, where, in speaking of the failure to remove the abscess, the court said: "If . . . the defendant did not follow such established practice in the care and treatment of the case for the detection and removal of such abscess, recognized, adopted, and followed by all physicians and surgeons of good standing," etc., it would be negligence. Counsel merely complains of the use of the word "all," and seems to have the impression that it required defendant to have and exercise the skill of all the physicians residing in his neighborhood. This, however, is a direct perversion of the sentence. It declared his liability only in case he omitted a practice which was recognized and adopted by all, in this respect being probably more favorable to the defendant than was justified.

After a careful examination of all of the errors assigned and discussed, we find none which justifies us in a reversal of the present judgment. It was an extremely mixed question how far the plaintiff's suffering and permanent dismemberment and impairment of genital function were due to the improper treatment which the jury found she received from the defendant, and how far merely to her disease, but that some were attributable to the former cause might legitimately have been decided by the jury. Her injuries were grievous, but would hardly support a verdict for the amount rendered, but for the permanent injury above mentioned. With that before us, if it resulted from such improper treatment, it is impossible to say that the damages are excessive. The question of severing that suffering and those damages which were the natural consequence and result of plaintiff's diseased condition and those which were occasioned or enhanced by de-

fendant's improper treatment was especially one for the jury. They were duly cautioned against allowing damages for any of the former class, or for any which were due to disobedience of instructions or neglect on the plaintiff's part; and we cannot say that they have not correctly resolved these questions of fact, wholly within their province.

*By the Court.*—Judgment affirmed.