NELSON, Administratrix, Respondent, vs. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

*November 13—December 4, 1906.*

*Evidence: Expert testimony: Witnesses: Examination of experts: Hypothetical questions: Competency: Paralysis: Railroads: Negligence in carrying passenger by his station: Contributory negligence: Proximate cause: Anticipation of injury: Instructions to jury: Prejudicial error.*

1. On the examination of an expert witness, omission to state in a hypothetical question details of evidentiary circumstances and conditions, which, though bearing on the inquiry propounded, are, however, merely cumulative of that which the hypothesis includes, does not affect the competency of the question nor the answer thereto, since the expert must be presumed to have taken into consideration all the facts expressly stated and necessarily implied.

2. On an issue as to whether an illness suffered by plaintiff had been aggravated by his being carried by his station on defendant's train (he thereafter having become permanently paralyzed), it is not error to take the opinion of physicians as to plaintiff's condition and to state the progress of his illness to the time he was carried by his station, without including his condition from that time to the time he became permanently paralyzed, where the opinion asked for was based on a series of facts understood and relied upon as descriptive and symptomatic of brain lesion and cerebral hemorrhage, and said to be known and relied upon in medical science.

3. In such case testimony of the physicians that the facts proven showed a stoppage of the hemorrhage causing the paralysis on the day plaintiff was carried by his station and a renewal thereafter, is not wholly incredible or conjectural and is within the field of opinion evidence,—the physicians having testified that a knowledge of the progress of the ailment throughout its history enabled them to know at any stage of the trouble, by an arrest of the progress of the paralysis, whether the incipient hemorrhage had ceased, although they admitted that the extent of the hemorrhage, when it had once commenced and continues, what it might result in, and the prognosis, might be uncertain.

4. In such case testimony of the physicians as to plaintiff's condition after he had been carried by his station and up to the time his attending physician saw him is *held* competent.

5. In such case a verdict in favor of plaintiff is *held* to be supported by evidence tending to show that plaintiff was injured by defendant's negligence in carrying plaintiff by his station.

6. Where a passenger, unknown to himself, was in fact suffering from a brain lesion accompanied by cerebral hemorrhage when he was carried by his railroad station, failure to seek medical advice and assistance at the place he left the train and walking around while waiting for the train which took him home do not show contributory negligence as matter of law, and that question was properly submitted to the jury.

7. In an action against a railroad company by a passenger suffering from incipient paralysis who was carried by his station and thereby the disease was so aggravated that complete paralysis ensued, the court submitted without comment or explanation a question of the special verdict inquiring whether the aggravation of plaintiff's condition was the natural and probable result of defendant's negligence, and then proceeded to read a question inquiring whether defendant ought to have anticipated some injury from its acts. Thereupon the court instructed the jury: "It is not necessary in answering this question for you to find that at that time, by reason of his being carried by, that aggravated paralysis might be the natural and probable result of such negligence, but it is sufficient if it now appears to have been a natural and probable consequence of such negligent act, if you find that it was a negligent act." *Held*, that thereby the court confused the ideas of proximate cause embodied in the questions of the special verdict, and failed to observe the distinction between the two elements as there set out.

8. In such case the error is *held* not prejudicial, since under the facts found by the jury reasonable anticipation of injury was the only element necessary to establish liability, and under the evidence, stated in the opinion, the court should have held, as matter of law, that the fact of anticipation was established.

APPEAL from a judgment of the circuit court for La Crosse county: J. J. FRUIT, Circuit Judge. *Affirmed.*

An action to recover for injuries which plaintiff's intestate is alleged to have sustained through the defendant's negligence. On February 20, 1903, Nels R. Nelson was a passenger for hire on defendant's train from Mankato, Minnesota, to La Crosse, Wisconsin. This train was due at La Crosse at 10:45 p. m. When it arrived at La Crosse Nelson was carried by, and at about midnight was left at West Sa-

lem, the next station, twelve miles distant from La Crosse. Here he remained the rest of the night and the following day. It is alleged that he was ill at this time, and that defendant's negligence increased and aggravated his illness, which resulted in permanent paralysis. The material facts of the case, which the evidence tended to establish, are as follows: Nelson resided at La Crosse, Wisconsin, and was a traveling salesman. On Sunday evening, February 15, 1903, he left home on a trip into Minnesota and arrived at Wells, Minnesota, Monday morning, where he stayed to transact some business. He left for Easton Tuesday morning. After his arrival he transacted some business and left there at 11:30 p. m. for Delavan, the next station, a short distance west, where he remained until the 5 p. m. passenger train, when he went to Winnebago City, arriving there shortly before 6 o'clock. After his arrival he partook of supper, and a short time afterward first began to feel somewhat ill. He says: "I felt trembling, shaky, sort of chill, if I may call it that, and sick at my stomach." About 9 o'clock he retired, but did not sleep well. He felt somewhat ill the next morning, but went to Elmore on an early morning train, and, arriving there about 9 o'clock, visited some customers during the forenoon, and then for the first time observed that he could not move and handle his left arm and leg as well as usual— they seemed more difficult to control. At about 2 o'clock in the afternoon he took a train from Elmore to Mankato to go home. At Mankato, where he arrived between 4 and 5 o'clock, he needed assistance to get off the train, and he says he needed this assistance because "I could not handle my arm and leg. I could not step down from the steps to the platform without some assistance." Two traveling men assisted him off the train by taking hold of his arms, one on each side, and then assisted him to the hotel, which was across the street and railway tracks from the station. At the hotel he wrote his name on the register, and then, with

the porter's assistance, walked to the elevator and thence to his room. He remained in his room during the evening, the night, and the following forenoon. In the evening he partook of a little lunch in his room, and retired about 9 o'clock; the porter assisting him to remove his clothing and to get into bed. About noon of the following day he arose, dressed, and, with the porter's assistance, walked downstairs. In the afternoon, at about 2 o'clock, he left the hotel to walk to the depot. The two men who had helped him off the train the day before again assisted him to the depot. At this time he found that his leg and arm were in about the same condition as the day previous. Mentally he felt no ill effects, and, so far as he could tell, his faculties were not clouded or dulled. At about 2 o'clock he was assisted in getting onto the train and into the coach of the train for La Crosse, where, excepting for a short stop at Winona, he remained until he landed at West Salem. At about 9 o'clock in the evening he got off the train at Winona, went to a lunchroom for some lunch, and then returned to the car. Here he received some help from a gentleman in mounting the step of the car. He resumed his place in the car, and after leaving the station told the conductor that he was not well and wanted to get home, and requested that he be called in order to get off the train at La Crosse. The persons in charge of the train and car wherein plaintiff rode were thus informed of his illness and of his desire to get off the train at La Crosse.

He did not hear the call for La Crosse, and did not discover this fact until the train had passed La Crosse. He then put on his overshoes, got up, walked to the conductor in the front end of the car, and stated that he wanted to get off at La Crosse. The conductor informed him that they had passed La Crosse, and that he could not let him off at the place where they were, but must take him to the next station, West Salem. This angered him somewhat, but he soon became composed and resumed his seat and rode to West Sa-

lem. Here he got off the train, the conductor and Mr. Wood, the hotel keeper at this place, helping him off, and Mr. Wood assisted him in walking to the hotel. This was between 11 and 12 o'clock. Mr. Wood provided him with lodging by having him occupy a room with a Mr. Larson, with whom Nelson had been intimately acquainted for a number of years. Nelson states that he felt sick, weak, and tired, and was in about the same condition as theretofore; that he did not know the nature of his affliction and how serious it was, but that he was somewhat frightened and anxious to get home to get help. He says he undressed to retire without Larson's assistance; but Larson states that he had observed that Nelson was lame, and that he helped him to remove his shoes and clothing and to retire. Nelson states that he did not sleep well; that he was restive and nervous; that he awoke at 6 o'clock in the morning, felt fatigued, had no appetite, wanted no breakfast; that his left leg and his arm were unruly and would not take hold of anything like his right arm; and that, excepting that he got up and went to the toilet for a drink of water, he remained in his bed until about 3 o'clock in the afternoon. Larson assisted him to dress when he got up in the afternoon. They conversed somewhat, and Larson says that Nelson's mind was somewhat dazed, and he was not as he was before. He helped him downstairs. Nelson stated that he wanted to go home on the train leaving about 5 o'clock. With Larson's assistance he walked from the hotel to Johnson's store, where he recognized and spoke to persons he had known. They then returned to the hotel, and, with Larson's help, he walked into the dining room, where he partook of some tea and toast. Larson testifies that he observed his face and noticed that the left side of his mouth dropped, and that, when he attempted to drink tea, some of it escaped from this side of his mouth. After supper he reclined on a lounge until about 7 o'clock, when they went to the train. Larson and another

gentleman assisted him to walk to the train and put him on board. Larson went with him to La Crosse, where he and the brakeman helped Nelson off the train. Larson and a hackman helped him into a hack, took him to his home, and helped him into the house, when Larson and the members of the family immediately assisted him upstairs. Larson testifies that they half carried and that he half walked up stairs to his bedroom, where the family helped to undress and assist him to bed. Dr. Gunderson was immediately called and soon appeared. He examined him and describes him as being numb in the whole left side of his body, including the tongue and face. He could move his left arm and foot somewhat, but was weak and feeble; tongue would fall to one side; was able to talk; sensorium a little cloudy, not as bright as before; thought he was suffering from quite a severe hemorrhage, which was increasing. During the first twenty-four hours he became so entirely paralyzed that he could not move his whole left side. His mind was a little cloudy, and he thought he would not recover from the ailment.

Nelson was well acquainted with the hotel keeper, Wood, Mr. Larson, and others at West Salem. He knew that there was telegraphic communication with La Crosse and telephonic connection between the hotel and his home. He was acquainted with the physicians in practice there. He sought no medical aid at this place, nor did he send for members of his family or his family physician at La Crosse. The opinion evidence of the physicians was to the effect that paralysis is caused by the rupture of a blood vessel in the brain. This permits suffusion of the blood and consequent pressure on the brain, destroying or impairing the centers of motion or sensation. The degree of paralysis depends upon the extent of the hemorrhage. The extent of the hemorrhage is judged by the indirect symptoms of the degree of impairment of motion and sensation. The progress of the hemorrhage and its cessation and recurrence can be diagnosed

only by the variations of these paralytic symptoms. The approved medical treatment is to keep the patient and his environment as quiet as possible, place him in a reclining position with the face upright, his head slightly elevated, to apply packs of ice to his head, and to evacuate his bowels. Excitement of the brain and nervous system from fright, anger, motion, or intense mental strain are injurious to the patient in the early stages of the ailment and tend to produce a recurrence of the hemorrhage. The causes producing the lesions of the brain and the resulting paralysis are not definitely known. It comes to persons under all circumstances and conditions, varying from extreme shocks, violent motion, and excitement to conditions of absence of shock, absolute quiet and repose, both mental and physical. In response to hypothetical questions based on the evidence adduced, the physicians gave it as their opinion that on Tuesday evening Nelson suffered a slight paralysis from a hemorrhage which soon reached its climax, and that it had stopped flowing before Thursday evening when he arrived at La Crosse; that his condition kept growing worse during the night and day at West Salem and upon his return home Friday night; that this aggravation of his condition indicated a recurrence of the hemorrhage; and that such a result was caused by the excitement incident to the worry, physical efforts, and mental strain to which he was subjected by being taken to West Salem, his stay there, and his return to La Crosse, and the consequent delay in receiving care, rest, quiet, and appropriate treatment at his home.

The case was submitted to the jury by a special verdict. They found that defendant was negligent in carrying Nelson by La Crosse; that from being so carried by his paralysis was aggravated; that such aggravation of Nelson's paralysis was the natural and proximate result of defendant's negligence in carrying him by La Crosse; and that, in the light of the attending circumstances, a person of ordinary intelligence and

prudence ought to have foreseen that some injury might result to Nelson. The court awarded judgment for plaintiff on the verdict for the amount assessed by the jury, and for costs. This is an appeal from such judgment.

*Edward M. Hyzer,* for the appellant.

For the respondent there were briefs by *Morris & Hartwell* and *Winter & Esch,* and oral argument by *Thomas Morris* and *Frank Winter.*

SIEBECKER, J. The errors assigned for reversal of the judgment go to the sufficiency of the facts to establish that Nelson suffered an injury through defendant's negligence, the want of any evidentiary basis for the opinion evidence of the physicians examined as experts concerning any change in Nelson's condition after Thursday evening from what it had been theretofore, and to alleged fatal defects in the hypothetical questions propounded, in that they assumed facts inconsistent with undisputed evidence, and other facts which were mere speculations and conjectures, wholly unsupported by the evidence and contrary to all reasonable inferences from the facts in the case. It is also claimed that the hypotheses so assumed and propounded omitted many facts shown by the evidence which are necessary and essential to enable the expert to give an intelligent and correct opinion on the subject. In view of the nature of the injury complained of and the conditions surrounding it, a proper consideration of these questions necessitates a close scrutiny of the facts and circumstances adduced by the evidence to ascertain their logical and natural consequences. For this purpose the somewhat extended and detailed statement of the evidentiary facts, as heretofore given, is required as the basis for the inferences which are decisive of the questions raised. It may be well to consider first whether the hypothetical questions, as framed, omitted material and essential evidentiary facts, within the scope of the inquiries to which they were directed.

The facts, suggested under the objection as being material to the inquiry but omitted, are evidentiary circumstances and conditions, which, though bearing on the inquiry propounded, are, however, merely cumulative of what the hypothesis included, and are covered by the facts assumed. Omission to state them in detail cannot affect the competency of the question nor the answer thereto, since the expert must be presumed to have taken into consideration all the facts expressly stated and what they necessarily implied. We deem the questions sufficiently inclusive of all evidentiary facts within the scope of the inquiry.

It is urged with much force that it was clearly erroneous to take the opinion of physicians as to Nelson's condition and to state the progress of his illness up to the time he went through La Crosse on Thursday evening, without including his condition from this time to the time of his arrival at home on Friday evening. This contention rests principally on the ground that no correct and reliable inference can be made by experts, in cases of this nature, without taking into consideration all the events and facts descriptive of the illness from its inception to its most serious stage, and that from its nature it is impossible to ascertain the state and progress of the illness by the indirect symptoms of paralysis. We do not find the first of these claims well founded. The opinions asked for were based on a series of facts which are understood and relied on as descriptive and symptomatic of brain lesion and cerebral hemorrhage, and are said to be known and relied on in medical science. The argument that this may be conceded and yet leave the vital objection unanswered, namely, that none of the symptoms or conditions enables the expert to judge whether cerebral hemorrhage had ceased on Thursday, is answered by the testimony of the experts that the facts proven show a stoppage of the hemorrhage. The explanation of this conclusion, that, if it had not so ceased, Nelson's condition on Thursday would necessarily have varied and have grown more serious from time to time than it in

fact appeared, is not so against reason and common sense that it must be rejected as wholly incredible and conjectural. True the witnesses admitted that the extent of a hemorrhage in the brain, when it has once commenced and continues, what it may result in, and the prognosis, may be very uncertain, yet they testify that a knowledge of the progress of the ailment throughout its history enables them to know at any stage of the trouble by an arrest in the progress of the paralysis whether the incipient hemorrhage has ceased. An uninterrupted hemorrhage is said to be accompanied by marked symptoms of increasing paralysis. The attending physician and Dr. Callaghan both testify that the facts left no uncertainty as to Nelson's condition on Thursday, and that the hemorrhage had stopped on that day. They also testify that the case showed symptoms of a renewal of the hemorrhage after Thursday and before Friday evening. We find no objection to this class of testimony. It is clearly within the field of opinion evidence. Such inferences from abnormal conditions are not within the field of common knowledge, and can only be made by persons possessed of expert knowledge on the subject. These requirements were fulfilled by the witnesses produced, and their testimony was properly received in the case. Upon like considerations it must be held that the hypothetical questions propounded to the physicians as to Nelson's condition after he had been carried by La Crosse and up to the time the attending physician saw him the following Friday evening were not objectionable upon either of the grounds. Such testimony was properly received. With this testimony in the case, the contention that the verdict is not supported by evidence tending to show that Nelson was injured by defendant's negligence cannot be sustained. We find that the testimony, showing a change in Nelson's condition on Friday, is sufficiently clear in its tendency and effect. It appeared that his trouble had progressed to a worse and more serious stage from that of the day before. It also appeared that this aggravated condition was attributable

to the fact of his being subjected to the mental strain and excitement, and the physical exertions he had to undergo on account of his stay at, his traveling to and from, West Salem, and his failure to obtain the quiet, rest, and medical attention he would have had had be been at home during this time.

It is further claimed that Nelson was guilty of contributory negligence in his attempts to walk about West Salem and in his omission to procure the aid of a physician at West Salem or that of his family physician, whom he could have reached from this place. It appears that neither Nelson nor his friends understood the nature of his physical condition, nor were they apprised that he was suffering from a brain lesion accompanied by cerebral hemorrhage. He was not informed that his condition required immediate medical attention. He believed that the physical exercise taken by him was conducive to his improvement. Under such circumstances his failure to seek medical advice and assistance at West Salem and his conduct in walking about the place do not in themselves clearly show negligence on his part that the court could so declare it as matter of law, and the determination of the question required submission to the jury upon all the evidence in the case.

Error is assigned upon the court's instruction given the jury in connection with question 6 of the special verdict. Without comment or explanation the court read to them question 5, whereby they were to determine whether or not, if they found Nelson's condition was aggravated after he was carried by La Crosse, such aggravation was the natural and probable result of defendant's negligence, and then proceeded, reading to them question 6, which was if the jury found the aggravated condition referred to in the sixth question existed, and was attributable to defendant's negligence,

"then ought a person of ordinary intelligence and prudence to have foreseen that some injury might result to the plaintiff in the light of the attending circumstances."

And then instructed the jury:

"It is not necessary in answering this question for you to find that at that time, by reason of his being carried by, that aggravated paralysis might be the natural and probable result of such negligence, but it is sufficient if it now appears to have been a natural and probable consequence of such negligent act, if you find that it was a negligent act."

The objections urged to this instruction are that it confused the ideas of proximate cause, embodied in questions 5 and 6, and failed to preserve the distinction between the two elements as there set out. These criticisms are pertinent, and the course pursued by the court was clearly a misdirection, in that the jury were instructed to pursue a course of inquiry in arriving at the determination of these questions which is directly contrary to that given for ascertaining facts by question 6, namely, whether a person of ordinary intelligence and prudence, in the light of the circumstances surrounding the commission of the negligent acts, ought to have anticipated that such negligence might cause injury to some one. This fact the jury must ascertain from viewing the situation as presented at the time of the omission of the alleged duty, in the light of the circumstances attending such default, and is not to be inferred from the consequences thereof. It seems quite evident that the instruction was misleading and was improperly applied to the inquiry under question 6. However, another consideration upon this branch of the case obviates any prejudicial error such misdirection might otherwise have caused, namely, the undisputed state of the evidence material to this inquiry. As applied to the facts before us, the inquiry is whether, in the light of the attending circumstances, the persons in charge of the train, who negligently carried Nelson in his sick condition by La Crosse, ought to have anticipated that this might cause him some injury. The facts of his affliction, which need not be here restated, were brought to the attention of the trainmen and

they were requested to put him off at La Crosse, and informed that he desired to get home for care and treatment. It seems obvious that, under such circumstances, an ordinarily prudent person would know that a sick person must necessarily be injured to some extent from the excitement incident to the worry, disappointment, and mental strain, and the additional physical exertion required for the extra travel, his stay among strangers at the hotel, and the delay in receiving proper rest, care, and medical attention. That defendant negligently carried Nelson by La Crosse, that his condition was in fact worse thereafter, and that this was the natural and probable result of defendant's negligence, are facts found by the jury, thus leaving only the fact of reasonable anticipation of injury under the circumstances necessary to establish liability. As we have shown, the court should have held as matter of law that this fact was established, and hence any error in submitting it to the jury cannot avail defendant. That the duty of reasonable anticipation of injury from negligent acts may be so apparent from the facts that it is to be inferred as matter of law has been held in various cases. A reference to *Allen v. Voje,* 114 Wis. 1, 89 N. W. 924, will suffice. There the subject was considered and discussed and cases collected on this subject.

We must hold that the evidence fully supports the verdict and the judgment and that no prejudicial error is shown in the record.

*By the Court.*—Judgment affirmed.