**Shelton D. HOOD, Petitioner,**

·v.

**Dr. John R. PHILLIPS, Respondent.**

**No. B–6113.**

Supreme Court of Texas.

June 29, 1977.

Rehearing Denied July 27, 1977.

John H. Holloway, Houston, for petitioner.

Hoover, Cox & Miller, Howard S. Hoover, Houston, Fulbright & Jaworski, W. N. Arnold, Jr. and Sandra Foster, Houston, for respondent.

SAM D. JOHNSON, Justice.

Seeking both actual and exemplary damages, Shelton Hood[1] sued Dr. John R. Phillips alleging he suffered injuries from surgery which was not a medically accepted method of treatment for emphysema. The trial court rendered judgment for Dr. Phillips after the jury refused to find he was guilty of gross negligence. Contending that the trial court should have submitted to the jury the issues of informed consent and ordinary negligence, should not have quashed subpoenas on the basis of Article 4447d, Section 3, Texas Revised Civil Statutes Annotated (Pamphlet Supplement 1974–1975), and should not have excluded certain other evidence, Hood appealed. The court of civil appeals reversed the judgment of the trial court and remanded the cause for a new trial on the grounds the case should not have been submitted on the theory of gross negligence but rather on a theory of ordinary negligence. 537 S.W.2d 291. On other grounds, we affirm the judgment of the court of civil appeals, which reversed the trial court judgment and remanded the cause for a new trial.

At trial, Dr. Phillips described the accepted medical treatment for emphysema as follows: (1) encourage the patient to stop smoking and to move to a dry, pollution-free climate; (2) use medication to lessen the bronchial spasm; (3) use machines to aid the patient in breathing; and (4) employ oxygen therapy. Dr. Phillips related that when he first examined Mr. Hood in 1966 he had emphysema. Attempting to reduce Mr. Hood's suffering, Dr. Phillips removed one of the carotid bodies from his neck.[2] Dr. Phillips testified he had employed this surgery since 1962 and by 1966 he had performed it between 1,200 and 1,500 times. In his experience, 85 percent of his patients were helped to some extent and 15 percent were not helped at all. He acknowledged that the use of this surgery was not generally accepted and was in fact highly controversial.

In contrast to the testimony of Dr. Phillips that carotid surgery generally produced beneficial results, three physicians testifying for Hood characterized carotid surgery as an unaccepted mode of treatment for emphysema, as a treatment not supported by medical evidence, and as a surgical procedure which had been tried by a number of physicians, found ineffectual, and abandoned.

Dr. Erin Longfield, Chief of Staff of the Veterans Administration Hospital located in Houston and a specialist in chest diseases, testified there was only one accepted medical treatment for emphysema; namely, the use of drugs and machines to assist the patient in breathing. Dr. Longfield asserted carotid surgery would not benefit anyone suffering from emphysema and that the performance of such surgery would be negligence. To his knowledge, such surgery was not used in any veterans' hospital.

Dr. William Thompson, a practicing osteopath in Harris County, agreed that the accepted treatment for emphysema included the use of drugs and machines to assist the patient in breathing, and added that on occasion chest surgery was employed to remove diseased bronchi from the lungs. This doctor had no knowledge of any medical support for carotid surgery as a cure for emphysema and no knowledge of any reputable physician using this method, as of 1966, to cure or relieve the symptoms of severe emphysema.

Dr. Thomas Petty, a physician employed by the University of Colorado Medical Center as an associate professor of medicine in

1. Prior to trial, Mr. Hood died. There is no contention that his death was caused by any action of Dr. Phillips.

2. As described by Dr. Phillips, this surgical procedure involved the removal of the carotid body and the nerves surrounding it. The carotid body is a receptor for chemical stimuli "sensitive to the concentration of carbon dioxide in the blood, and assist[s] in reflex control of respiration." Henry Gray, F.R.S., *Anatomy of the Human Body,* at 895 (29th Am. ed. 1973). At trial, Dr. Phillips explained the surgical removal of the carotid body as an attempt to improve the airflow to the lungs by lessening the spasms of the involuntary muscles in the bronchial tubes.

charge of the pulmonary disease division, testified upon deposition by written questions that carotid surgery is not an accepted procedure for the cure or treatment of emphysema. He stated: "[T]he procedure has been proposed really without much scientific rationale, tried by a number of physicians worldwide; found ineffectual and abandoned. In my own judgment, the procedure is not only not beneficial, but potentially harmful." He described the accepted treatment for emphysema as a combination of the use of drugs, the systematic use of inhaled aerosol to help combat the disease, and the application of physical medicine techniques designed to improve breathing efficiency and to promote the physical reconditioning of the patient.

According to the testimony of Dr. Phillips on the issue of informed consent, the doctor told Mr. Hood of the risks of the surgical removal of the carotid body in accordance with medically accepted standards. Dr. Phillips maintained he informed Mr. Hood of the risk of death, the possibility of numbness in his jaw and his ear, the danger of a heart attack or a stroke, the possibility of soreness in the windpipe, and the possibility of infection of the prostate gland. He did not tell Mr. Hood high blood pressure may be a result of the operation, and Dr. Phillips emphasized that no physician would have warned Mr. Hood of this danger because it was negligible. Dr. Phillips asserted he did not commit himself to the size of the incision he would make during the course of the operation and, furthermore, did not guarantee Mr. Hood he would cure him, but instead expressed the hope the operation

would help him. Dr. Phillips stated he knew Mr. Hood was an uneducated man and he described the carotid body as similar to a valve in an automobile tire because Mr. Hood would understand that explanation.[3]

Contrary to the testimony of Dr. Phillips, Mr. Hood stated upon deposition that Dr. Phillips did not tell him 15 percent of those undergoing this surgery did not receive any relief. Mr. Hood insisted Dr. Phillips guaranteed to cure his emphysema. Mr. Hood also stated that Dr. Phillips represented the incision would be small and that he would no longer need medication for emphysema after the operation. He asserted Dr. Phillips did not tell him that the operation would require the removal of nerves from his neck, did not mention his heart in any way, and did not inform him that the operation might result in high blood pressure.

Mrs. Hood, who was present during the conversation between her husband and Dr. Phillips, testified Dr. Phillips promised to cure the emphysema, represented that the incision would be small, indicated that there would be no risk or ill effects connected with the surgery, and did not state that he would remove nerves from the neck.

The trial court refused to submit plaintiff Hood's issue on informed consent and ordinary negligence. It did submit an issue on whether the carotid surgery was gross negligence on the part of Dr. Phillips, and the jury refused to find Dr. Phillips grossly negligent.

The court of civil appeals reversed and remanded on the grounds the plaintiff, Hood, should not have been required to

---

3. The full response of Dr. Phillips to the question asked at trial regarding the "valve" explanation was as follows:
"Q Now there is no valve effect with the carotid body that is removed, is there?
"A This spasmodic element which causes a valve like effect, the mechanism of a valve like effect affects the entire bronchial tube tree. The operation is done in the neck and the sympathetic effect is to the lungs. There is no operation to the lungs at all. It is a sympathetic effect to the bronchial tubes. You see, the bronchial tubes have muscles in them, it is involuntary muscle, and when you go into a spasm or have a spasm in this vein those bronchial tubes close off. Now there is swelling or narrowing. Then the air gets in easier and when it closes by coughing or spasm, then the air has difficulty in getting out. It is merely . . There is no removal of the valve, it was just a method of attempting to explain to the patient air flow. For example, you have an air tire and you have a valve and you pump it up. The air goes in and none comes out. But if that valve is removed, why then you pump it up, the air immediately comes out. It was a method of explaining . . really there was no valve removed."

meet the higher burden imposed by a gross negligence standard but rather should have been required to meet the following ordinary negligence standard:

"[A] physician is not guilty of malpractice where the method of treatment used is supported by a *respectable minority of physicians,* as long as the physician has adhered to the acceptable procedures of administering the treatment as espoused by the minority." 537 S.W.2d 291 at 294. [Emphasis added.]

At this juncture, we note that the above standard articulated by the court of civil appeals was intended to apply to a negligence suit based on allegations that the mode or form of medical treatment was not a proper remedy for the diagnosed condition. It was not intended to apply to an action based on the negligent performance of the correct remedy for the diagnosed condition.

The court of civil appeals also held: (1) there was no evidence to support the submission of the issue of whether Dr. Phillips failed to obtain the consent to surgery of Mr. Hood; and (2) the trial court acted properly in quashing subpoenas directing Dr. Phillips to produce records in his possession and in quashing subpoenas to the executive secretary to the Harris County Medical Society on the basis of Article 4447d, Section 3.

Both Dr. Phillips and Hood applied for writs of error to this court and both writs were granted.

### THE NEGLIGENCE STANDARD

It should be noted at the outset that Hood does not assert that the surgical removal of the carotid body was unskillfully or negligently performed. Nor does Hood contend that Dr. Phillips' diagnosis of emphysema was incorrect. Instead, the patient-plaintiff maintains that it was negligence to utilize this particular surgical procedure as a method of treating emphysema.

Both Hood and Dr. Phillips assert the court of civil appeals erred in adopting the "respectable minority" negligence standard. There are at least four standards that may be applied to a medical malpractice suit based on the assertion that the mode or form of treatment was not a remedy for the diagnosed condition.

RESPECTABLE

MINORITY: The "respectable minority" standard approved in the instant case by the court of civil appeals was adopted in *Leech v. Bralliar,* 275 F.Supp. 897 (D.Ariz. 1967); *Baldor v. Rogers,* 81 So.2d 658 (Fla. 1954); *Walkenhorst v. Kesler,* 92 Utah 312, 67 P.2d 654 (1937); *Gruginski v. Lane,* 177 Wash. 121, 30 P.2d 970 (1934); *Swanson v. Hood,* 99 Wash. 506, 170 P. 135 (1918); *Dahl v. Wagner,* 87 Wash. 492, 151 P. 1079 (1915); and *Smith v. Beard,* 56 Wyo. 375, 110 P.2d 260 (1941).

In *McHugh v. Audet,* 72 F.Supp. 394, 400 (M.D.Pa.1947), the court adopted a slightly different standard: "Where *competent* medical authority is divided a physician or surgeon will not be held responsible if in the exercise of his judgment he followed the course of treatment advocated by a *considerable number* of his professional brethren in good standing in his community." [Emphasis added.] *Accord, Fritz v. Parke Davis and Company,* 277 Minn. 210, 152 N.W.2d 129 (1967); *Scheuler v. Strelinger,* 43 N.J. 330, 204 A.2d 577 (1964); *Duckworth v. Bennett,* 320 Pa. 47, 181 A. 558 (1935); *Gresham v. Ford,* 192 Tenn. 310, 241 S.W.2d 408 (1951); *McPeak v. Vanderbilt University Hospital,* 33 Tenn.App. 76, 229 S.W.2d 150 (1950).

REASONABLE
SURGEONS
WOULD
DISAGREE: Dr. Phillips maintains it was error for the court of civil appeals to adopt the "respectable minority" standard. He proposes the following test:

"When *reasonable surgeons would disagree* as to either the need for an operation or the procedure employed, the decision is a matter of surgical judgment, and the surgeon will not be liable even if it subsequently appears that the organ removed was healthy or the operation itself was not needed or was unsuccessful." [Emphasis added.]

See Graham v. Alcoa S. S. Co., 201 F.2d 423 (3d Cir.), cert. denied, 346 U.S. 832, 74 S.Ct. 32, 98 L.Ed. 335 (1953); Snyder v. St. Louis Southwestern Ry. Co., 228 Mo.App. 626, 72 S.W.2d 504 (1934).

ANY VARIANCE: Some courts have held any variance from the accepted mode of treatment renders the physician liable. In Jackson v. Burnham, 20 Colo. 532, 39 P. 577, 580 (1895), it was stated that "when a particular mode of treatment is upheld by a consensus of opinion among the members of the profession, it should be followed by the ordinary practitioner; and if a physician sees fit to experiment with some other mode, he should do so at his peril." Accord, Allen v. Voje, 114 Wis. 1, 89 N.W. 924 (1902).

REASONABLE AND PRUDENT DOCTOR: The following standard has been applied in Texas in other medical malpractice suits—". . . what a reasonable and prudent doctor would have done under the same or similar circumstances." Snow v. Bond, 438 S.W.2d 549, 550 (Tex.1969).

This review of the various standards reveals most courts have not attempted to articulate a distinction among "experimental," "outmoded," "rejected," and "accepted" surgical procedures. Instead, the majority of courts have attempted to draw a line between the reasonable and prudent physician who, as a last resort, turns to an "experimental" or a "rejected" treatment in the hope of assisting the patient and the individual practitioner who attempts to beguile his patient with false or distorted promises. These courts have recognized, as we do, that physicians should be allowed to exercise their professional judgment in selecting a mode or form of treatment. Further, physicians should be allowed to experiment in order that medical science can provide greater benefits for humankind. Consequently, we reject the "any variance" standard.

The "respectable minority" standard adopted by the court of civil appeals and "considerable number" test could convey to a jury the incorrect notion that the standard for malpractice is to be determined by a poll of the medical profession. Accordingly, these standards are rejected.

■ Dr. Phillips' proposed "reasonable surgeons would disagree" standard and the "what a reasonable and prudent doctor would have done" standard, which has been applied in other medical malpractice suits, appear to be simply different ways of reaching the same objective—preclude the imposition of liability on the reasonable and prudent physician and permit liability on the one who is not. We are of the opinion that the statement of the law most serviceable to this jurisdiction is as follows: A physician who undertakes a mode or form of treatment which a reasonable and prudent member of the medical profession would undertake under the same or similar circumstances shall not be subject to liability for harm caused thereby to the patient. The question which conveys to the jury the standard which should be applicable is as follows: Did the physician undertake a mode or form of treatment which a reasonable and prudent member of the medical profession would not undertake under the same or similar circumstances? See Snow v. Bond, supra; McCoid, Some Particular Duties of Medical Practitioners, in Clinical Investigation in Medicine: Legal, Ethical, and Moral Aspects 216 (1963). Generally this standard should be applied whether the mode or form of treatment is "experimental," "outmoded," or "rejected."

■ The burden of proof is on the patient-plaintiff to establish that the physician-defendant has undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances. The circumstances to be considered include, but are not limited to, the expertise of and means available to the physician-defendant, the health of the patient, and the state of medical knowledge. Unless the mode or form of treatment is a matter of common knowledge or is within the experience of the

layman, expert testimony will be required to meet this burden of proof. In the instant case there was expert medical testimony characterizing carotid surgery as an unaccepted mode of treatment for emphysema, as a controversial procedure, as a treatment not supported by medical evidence, and as a surgical procedure which had been tried by a number of physicians, found ineffectual, and abandoned. Although the trial court refused to submit an issue regarding ordinary negligence, this evidence would raise a question of fact for the jury on the issue of ordinary negligence and such issue should have been submitted.

## GROSS NEGLIGENCE

■ Hood next contends it was error for the court of civil appeals to hold that the trial court should not have submitted the issue of gross negligence in this medical malpractice suit. The court of civil appeals correctly held that Hood did not have to establish gross negligence in order to recover in a medical malpractice suit. Hood only had to prove ordinary negligence. However, the record in this case is such that not only was Hood entitled to an issue regarding ordinary negligence, but also an issue concerning gross negligence.

■ The issue of gross negligence has been submitted to the jury in several Texas medical malpractice cases. *Brooke v. Clark,* 57 Tex. 105 (1882); *Gaut v. Quast,* 505 S.W.2d 367 (Tex.Civ.App.—Houston [14th Dist.]), *writ ref'd n. r. e. per curiam,* 510 S.W.2d 90 (Tex.1974); *Jeffcoat v. Phillips,* 417 S.W.2d 903 (Tex.Civ.App.—Texarkana 1967, writ ref'd n. r. e.). Other courts have also held it proper to submit the issue of gross negligence to a jury in a medical malpractice case. *Green v. Hale,* 433 F.2d 324 (5th Cir. 1970); *Los Alamos Medical Center v. Coe,* 58 N.M. 686, 275 P.2d 175 (1954); *Rennewanz v. Dean,* 114 Or. 259, 229 P. 372 (1924).

This court has defined gross negligence as "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *McPhearson v. Sullivan,* 463 S.W.2d 174, at 174 (Tex.1971). With respect to the instant case, the testimony by doctors Petty, Thompson, and Longfield that carotid surgery is not an acceptable method for the treatment of emphysema and the further testimony that the method had been rejected and was not being employed by reputable physicians would raise a fact issue as to whether Dr. Phillips performed this type of surgery with conscious indifference to the welfare of Hood. The testimony in the instant case would therefore entitle Hood to a submission to the jury of an issue concerning gross negligence and, accordingly, an issue regarding exemplary damages.

## INFORMED CONSENT

■ Hood next argues it was error for the trial court to refuse to submit the issue of informed consent to the jury. This court, in *Wilson v. Scott,* 412 S.W.2d 299, 301 (Tex.1967), held "[p]hysicians and surgeons have a duty to make a reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment." The court also held the patient had the burden to prove by expert medical evidence what a reasonable practitioner of the same school and same or similar community under the same or similar circumstances would have disclosed to the patient and that such medical standard of disclosure may be proven by testimony of the physician-defendant.

The evidence in this case was such that the issue of informed consent should have been submitted to the jury. Mr. Hood testified Dr. Phillips promised to cure his emphysema and to make a small incision, and he asserted Dr. Phillips did not mention his heart in any way, the possibility of numbness, the removal of nerves, or the lack of success in 15 percent of the operations. Mrs. Hood, who was present during the conversation between her husband and Dr. Phillips, corroborated this testimony. In contrast, Dr. Phillips testified a physician should inform a patient, and that he did inform this patient, of the possibility of

numbness, a heart attack, or a stroke; of the 15 percent of the patients who received no benefit; and of the removal of nerves. He also asserted a physician should not, and that he did not, commit himself to the size of the incision. The conflict in the evidence on this issue is clear. Accordingly, the trial court should have submitted the issue of informed consent to the jury.

### ARTICLE 4447d

■ Hood next asserts the court of civil appeals erred in upholding the trial court's action in quashing subpoenas requiring Dr. Phillips to produce records in his possession and in quashing subpoenas requiring the executive secretary at the Harris County Medical Society to produce records in the Society's possession. The court of civil appeals upheld the trial court on the basis of the following statute, Article 4447d, Section 3:

> "The records and proceedings of any *hospital committee, medical organization committee or extended care facility committee* established under state or federal law or regulations or under the by-laws, rules or regulations of such organization or institution shall be confidential and shall be used by such committee and the members thereof only in the exercise of the proper functions of the committee and shall not be public records and shall not be available for court subpoena; provided, however, that nothing herein shall apply to records made or maintained in the regular course of business by a hospital or extended care facility. . . ." [Emphasis added.]

Dr. Phillips' records are not protected by this statute even though these documents may be contained in the records of one of the hospital committees. *Texarkana Memorial Hospital, Inc. v. Honorable Guy Jones, Judge,* 551 S.W.2d 33 (Tex.1977).

Some of the items sought from Dr. Phillips included:

1. "All reports or correspondence with any patient in which carotid body surgery was performed reporting to Dr. Phillips as to the effect of such surgery."

2. "All records of the 189 patients in which he claims attained 85% relief in accordance with the article printed in the Journal of the International College of Surgeons, July, 1965, Section I, Volume 44, No. 1, beginning at page 253, and copies of the post-operative studies indicating improvement."

3. "All of the patient records and follow-up records of the 200 surgical cases referred to in article entitled 'Glomectomy for Asthma and Emphysema' presented before the General Surgical Section at the 113th American Medical Association meeting in San Francisco on June 22, 1964, and appearing in the Journal of Abdominal Surgery, Volume 7, Number 3, May, 1965."

Since these three items were sought for the purpose of establishing whether Dr. Phillips' claimed results were substantiated by his records, they would be material and relevant to the issues of whether Dr. Phillips did inform Hood of the actual success rate of carotid surgery, whether Dr. Phillips had reason to believe this operation could assist an individual suffering from emphysema, and whether Dr. Phillips performed the surgery with conscious indifference to the welfare of Hood.

In view of the holding that Dr. Phillips' records are not protected by Article 4447d, the trial court should review not only the three items referred to previously, but all items sought from Dr. Phillips to ascertain whether they are discoverable. Rule 167, Texas Rules of Civil Procedure. In order to protect the privacy of Dr. Phillips' patients, the trial court may order an *in camera* inspection of these records.

Hood also sought information from the executive secretary of the Harris County Medical Society. Upon remand, discovery of these documents would be governed by *Texarkana Memorial Hospital, Inc. v. Honorable Guy Jones, Judge, supra.*

#### EXCLUDED EVIDENCE

 Hood also contends the trial court's exclusion of certain evidence and the approval of such exclusion by the court of civil appeals were errors. An examination of this evidence reveals that only a portion of it should have been admitted; namely, the testimony by Dr. Petty characterizing as outrageous the statement by Dr. Phillips that carotid surgery was similar to the removal of a valve from an automobile tire. Such testimony would be material and relevant on the issue of informed consent; that is, whether Dr. Phillips accurately described the procedure to Mr. Hood so he could make a knowledgeable decision as to whether to consent to the surgery.

The points of error presented in Dr. Phillips' application for writ of error, other than the point regarding the "respectable minority" standard, are without merit.

The judgment of the court of civil appeals, which reversed the trial court judgment and remanded the cause to the trial court, is affirmed.