Peter ECKERT, Individually and on behalf of Randall Eckert, a Minor

v.

Dr. Sidney SMITH.

No. 9031.

Court of Civil Appeals of Texas, Amarillo.

Oct. 24, 1979.

Rehearing Denied Nov. 21, 1979.

Windle Turley and Larry Hayes, Law Offices of Windle Turley, Dallas, for appellant.

Thompson & Knight, David S. Kidder and Jerry Grissom, Dallas, for appellee.

DODSON, Justice.

Peter Eckert, individually and on behalf of his minor son, Randal Eckert, brought this action for damages against Dr. Sidney Smith, M.D. He alleged *inter alia* that Dr. Smith negligently diagnosed and treated Beverly Eckert and that such negligence was a proximate cause of her death. Mrs. Eckert was the wife of Peter and the mother of Randal Eckert. The case was tried with a jury. The jury refused to find Dr.

Smith negligent in either diagnosing or treating Mrs. Eckert. No other negligence issues were requested or submitted to the jury. On the jury's verdict, the trial court entered a take-nothing judgment in favor of Dr. Smith. Mr. Eckert appeals from the judgment.

On appeal, Mr. Eckert brings five points of error. He attacks the trial court's definitions of timely diagnosis and proper treatment because each definition includes a community standard of care, i. e., Dallas County, Texas. He further complains of the trial court's refusal to submit loss of love and affection as an element of damages and the trial court's denial of a new trial based on newly discovered evidence. We affirm the judgment.

Beverly Eckert expired in the Garland Memorial Hospital in Dallas County, Texas on Sunday 23 February 1975. She was approximately seven months pregnant at the time, and was a patient of Dr. William Adams for prenatal care. Dr. Adams and Dr. Smith were partners in the practice of medicine in Garland. Dr. Smith was on weekend call to take care of their respective patients.

Mrs. Eckert became ill on Saturday afternoon 22 February 1975. Mr. Eckert contacted Dr. Smith by calling Dr. Adam's answering service. At 5:35 p. m. on this day, Mrs. Eckert entered the emergency room of Memorial Hospital at Dr. Smith's direction. Dr. Smith, a board certified specialist in obstetrics and gynecology, had never previously examined Mrs. Eckert.

At the emergency room, Mrs. Eckert complained of chills, diarrhea and abdominal pain. These complaints were consistent with an illness prevalent in the Garland area at the time. Dr. Smith's examination revealed that Mrs. Eckert was lucid, had normal vital signs under the circumstances, and no vaginal bleeding. He ruled out placental abruption[1] after a manual examination of the uterus and auditory recognition of fetal heart tones. He concluded that she was mildly dehydrated, was suffering from gastroenteritis which was probably viral, and was possibly anemic.

Dr. Smith had Mrs. Eckert admitted to the hospital and gave certain orders for her continuing care and treatment. These orders included I.V.s, lomotile, pain medication and certain lab tests.

Dr. Smith next examined Mrs. Eckert the following morning. His time of arrival at the hospital and time of the examination were disputed. He said he arrived at the hospital about 10:00 a. m., tended to another patient and then examined Mrs. Eckert at about 10:30 a. m. Mr. Eckert attempted to establish that Dr. Smith arrived at the hospital approximately one hour earlier.

The Sunday morning examination revealed that Mrs. Eckert was still in pain but the diarrhea had been controlled. He said she appeared alert and improved. She stated that she was hungry. She had not requested pain medication since 8:00 a. m. that morning. He again ruled out placental abruption and found normal fetal heart tones.

After this examination he received a laboratory report which showed a low blood count. He ordered a second complete blood count "stat" and a type and cross-match for a blood transfusion. While waiting for this laboratory work, he attempted to determine the location of the blood loss. After he ruled out rectal or uterine bleeding, he thought a gastro-intestinal bleeding most likely and sought a consult before initiating invasive surgery. He considered the invasive surgery dangerous to the mother and child.

Dr. Smith's testimony showed that he was in attendance to Mrs. Eckert from the time of the initial Sunday morning examination until approximately 11:55 a. m. He testified that he was called to another floor of the hospital to admit another patient for

---

1. Abruption of the placenta or *abruptio placenta* is a premature separation of the placenta from the surface of the interior of the womb. The result of this condition is a one hundred percent mortality rate for the fetus. 4B R. Gray, Attorney's Textbook of Medicine § 311.-82(3) (3rd ed. Supp. 1979).

delivery. He called the nurse's station to check on Mrs. Eckert's condition and to determine if the blood had arrived for transfusion. He was informed that Mrs. Eckert was in cardiac arrest and that the cardiopulmonary team had been notified. Dr. Smith went to Mrs. Eckert's room and participated in the resuscitation efforts.

The undisputed evidence shows that a nurse found Mrs. Eckert pulseless, non-responsive and without respiration; that a cardiopulmonary team was called at 12:05 p. m.; that the resuscitative efforts were unsuccessful; and that the cause of the death was a cardiac arrest due to intra-abdominal hemorrhage from placenta percreta.[2]

Mr. Eckert presented evidence from two medical experts. By these experts, Mr. Eckert attempted to show that Dr. Smith was negligent in not timely diagnosing and properly treating Mrs. Eckert's condition. In essence, these experts said that Dr. Smith failed to promptly order proper lab studies, over-sedated the patient, and failed to appreciate factors pointing to internal hemorrhaging and shock.

In summary, Dr. Smith and other medical experts testified that the lab reports were verbally ordered according to established medical practice and custom; that the monitoring of vital signs as ordered was sufficient; that the dosage of medication was moderate; that the diagnosis of gastroenteritis was reasonable and that hemorrhaging was not indicated by Mrs. Eckert's symptoms; that Dr. Smith's response was appropriate under the circumstances; and that Mrs. Eckert's demise was caused by an acute episode of placenta percreta occurring late on Sunday morning causing rapid massive internal hemorrhaging which filled the retroperitoneal space with 4000 cc. of blood within minutes.

Dr. Smith testified, without contradiction, that placenta percreta is a rare condition in pregnancy, in which the placenta mines through the uterus wall; that since the onset of medical literature there have been only 37 reported occurrences of the condition, which were similar to Mrs. Eckert's condition; and that he previously had not seen the condition in his extensive practice.

In special issue number one, the court inquired of the jury, "Do you find from a preponderance of the evidence that Dr. Smith failed to timely diagnose internal hemorrhaging of Mrs. Eckert?" and in issue number three, "Do you find from a preponderance of the evidence that Dr. Smith failed to properly treat her internal hemorrhaging?". The court used a community standard in defining the terms "timely diagnose" and "properly treat." These instructions state that "timely diagnose" means "such time as a reasonably prudent physician practicing in Dr. Smith's specialty in Dallas County, Texas, would have diagnosed under the same or similar circumstances," and that "properly treat" means "such treatment as would have been rendered by a reasonably prudent physician of Dr. Smith's specialty in Dallas County, Texas, under the same or similar circumstances."

Mr. Eckert objected to the instructions stating that the phrase "Dallas County, Texas," should have been omitted on the general grounds that the instructions focus "the conduct of defendant in both issues No. 1 and No. 3 upon what a reasonably prudent physician in Dallas County, Texas would have done and contrary to the law, the instruction should not be so limited." In his brief, he says the instructions are contrary to the law and a comment on the weight of the evidence.

■ In his objections to the charge, Mr. Eckert made no challenge to the instructions on the grounds that such instructions constitute a comment on the weight of the evidence. Rule 274 of the Texas Rules of Civil Procedure provides, in part:

2. An autopsy revealed that Mrs. Eckert's death was precipitated by a rare condition, *placenta percreta*, in which the placenta grows or mines through the wall of the uterus. In Mrs. Eckert's case, the placenta had grown through the wall of the uterus creating a three centimeter tear in the uterine artery.

A party objecting to a charge must point out distinctly the matter to which he objects and the grounds of his objection. Any complaint as to an instruction, issue, definition or explanatory instruction, on account of any defect, omission, or fault in pleading, shall be deemed waived unless specifically included in the objections.

Under the circumstances, we must conclude that Mr. Eckert waived his challenge to the instructions on the comment on the weight of the evidence grounds.

█ Mr. Eckert further contends that the community standard is "contrary to the law," and that the trial court committed reversible error by including the standard in the instructions. In essence, he opts for a complete demise of the community standard or locality rule in medical malpractice actions in this state. In support of his position, he says the decision in *Hood v. Phillips*, 554 S.W.2d 160 (Tex.1977) "demonstrates that the last vestiges of the locality rule has [*sic*] now disappeared from Texas jurisprudence." We disagree.

The *Hood* case was a medical malpractice action based on an assertion that the mode or form of treatment was not a remedy for the diagnosed condition. The patient had emphysema. Attempting to reduce the patient's suffering, the doctor removed one of the carotid bodies from the patient's neck. The doctor acknowledged that the use of this type of surgery was not generally accepted and was in fact highly controversial. The authoritative medical testimony showed that the procedure had been proposed without much scientific rationale, tried by a number of physicians worldwide, found ineffective and abandoned.

In *Hood*, the Court observed that courts from other jurisdictions had applied at least four standards to medical malpractice actions based on assertions that the *mode* or *form* of treatment *was not* a remedy for the

diagnosed condition. After reviewing the various standards, the Court stated:

> We are of the opinion that the statement of the law most serviceable to this jurisdiction is as follows: A physician who undertakes a mode or form of treatment which a reasonable and prudent member of the medical profession would undertake under the same or similar circumstances shall not be subject to liability for harm caused thereby to the patient. The question which conveys to the jury the standard which should be applicable is as follows: *Did the physician undertake a mode or form of treatment which a reasonable and prudent member of the medical profession would not undertake under the same or similar circumstances?* (Emphasis added).

*Hood v. Phillips, supra,* at 165. The Court also pointed out that "[g]enerally this standard should be applied whether the *mode* or *form* of treatment is 'experimental', 'outmoded', or 'rejected'." (Emphasis added). *Id.* at 165. In our opinion, the decision in *Hood* does not preclude the use of the community standard in the case before us and does not direct a different standard.

Texas adopted the "same or similar communities" standard in *Turner v. Stoker*, 289 S.W. 190, 194 (Tex.Civ.App.—Eastland 1926, writ ref'd). In *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (1949), the Texas Supreme Court further required medical evidence from a physician of the same school of practice to establish the "same or similar communities" standard. In *Porter v. Puryear*, 153 Tex. 82, 262 S.W.2d 933, 936 (1953), 264 S.W.2d 689 (1954), however, the same school of practice rule in areas of practice common to different schools was rejected. The court determined that testimony by medical doctors concerning the proper method of administering a spinal anesthetic was admissible in an action against an osteopathic doctor.[3]

3. Although the judgment in *Porter v. Puryear*, 153 Tex. 82, 262 S.W.2d 933 (1953) was set aside by the Texas Supreme Court on the second motion for rehearing in *Puryear v. Porter*, 153 Tex. 82, 264 S.W.2d 689 (1954), the opinion is not withdrawn. Therefore, we feel the point is still valid. *See Snow v. Bond*, 438 S.W.2d 549, 550 (Tex.1969); *Insurance Company of North America v. Myers*, 411 S.W.2d 710, 714 (Tex.1966); *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex.1966).

In general, the Texas cases since *Porter v. Puryear, supra,* have dealt with and determined admissible the testimony by doctors from different geographical areas, testimony by specialists in actions against general practitioners, and other similar situations. This line of cases is exemplified by *Hood v. Phillips,* 554 S.W.2d 160 (Tex.1977) (Colorado physician testified carotid surgery was not accepted treatment for emphysema); *Webb v. Jorns,* 488 S.W.2d 407 (Tex.1972) (physician testified as to standard of care required of nurse anesthetists); *Lee v. Andrews,* 545 S.W.2d 238 (Tex.Civ. App.—Amarillo 1976, writ dism'd by agr.) (New York pathologist competent to testify as to standards applicable to general practitioner because he was familiar with such standards); *Simpson v. Glenn,* 537 S.W.2d 114 (Tex.Civ.App.—Amarillo 1976, writ ref'd n. r. e.) (Arizona specialist in obstetrics and gynecology competent to testify as to post-operative standard of care in suit against general surgeon); *Cleveland v. Edwards,* 494 S.W.2d 578 (Tex.Civ.App.— Houston [14th Dist.] 1973, no writ) (testimony of Louisiana surgeon raised medical proof of both malpractice and causation); *Christian v. Jeter,* 445 S.W.2d 51 (Tex.Civ. App.—Waco 1969, writ ref'd n. r. e.) (Dallas orthopedic specialist allowed to testify as to standard required of Ennis general practitioner). We deem it unnecessary to the disposition of this case to fully trace the evolution of the application and administration of the community standard rule in this state.

The usual criticism of the locality rule, applied in its strictest sense, is that the standard of care for the defendant physician must be established by testimony from another physician practicing in the same locality as the defendant and that it tends to perpetuate and protect an inferior local standard of care. *See A Study of Medical Malpractice in Texas,* 7 St. Mary's L. J. 732, 744 & n. 57 (1976). Neither of these factors are present in the case before us.

At the trial, Mr. Eckert presented medical testimony from two doctors to support his position on the alleged negligent acts or omissions by Dr. Smith. These witnesses were Dr. Christine Haycock, M.D. and Dr. Albert B. Kapstrom, M.D. Dr. Kapstrom practices his specialties in obstetrics, gynecology and infertility at the Cedars Sinai Medical Center in Los Angeles County, California. He is a fellow of the American College of Obstetricians & Gynecologists. He holds membership in several other medical organizations. Dr. Haycock is a general surgeon with a particular interest in trauma. She is an Associate Professor of Surgery and Chief of the Division of Trauma, New Jersey Medical School at Newark, New Jersey. She is a Fellow of the American College of Surgeons and holds membership in several other medical organizations. She presents lectures on management of trauma, emergency treatment of abdominal injuries and abdominal hemorrhages, and the use of a peritoneal lavage and a catheter in diagnosing internal hemorrhaging.

Mr. Eckert points us to no medical testimony from his experts, which was excluded on community standard grounds, and our review of the record reveals none. Moreover, he does not contend that the Dallas County, Texas standard applied in this case is inferior to a statewide or so-called national minimum standard. In fact, the evidence by Mr. Eckert's medical experts shows that the Dallas County standard is equal to or greater than national minimum standards.

In *Webb v. Jorns,* 488 S.W.2d 407, 411 (Tex.1972), our Supreme Court directed "the administration of the community standard" to the discretion of the trial court. Mr. Eckert does not contend that the trial court abused its discretion by employing the Dallas County, Texas community standard in the instructions. Our review of the record reveals that such a contention would be without merit. Moreover, from our review and consideration of the entire record in this case, we are of the opinion that the challenged instructions were not reasonably calculated to cause and probably did not cause the rendition of an improper verdict in this case. *See* Tex.R.Civ.P. 434. Under

the circumstances of this case, we conclude that the trial court did not commit reversible error by employing the Dallas County, Texas standard in the challenged instructions.

Mr. Eckert further complains that the trial court committed reversible error by refusing to submit his requested issues on loss of love and affection for himself and his son Randal as a result of Mrs. Eckert's death. Under our disposition of this case, the jury's refusal to find that Dr. Smith was negligent in his diagnosis and treatment of Mrs. Eckert renders the damage issues immaterial. *See Hunter v. Robison*, 488 S.W.2d 555, 560, 561 (Tex.Civ.App.— Dallas 1972, writ ref'd n. r. e.) and the case cited therein on page 561. Accordingly, we overrule this contention.

Lastly, Mr. Eckert contends the trial court committed reversible error by not granting him a new trial on newly discovered evidence. In essence the new evidence is that Dr. Smith saw Judi Penny, another patient, on the morning of 23 February 1975, in addition to Mrs. Eckert and the two other patients he recalled seeing on that day.

The test for a new trial on these grounds requires, *inter alia*, that newly discovered evidence is not merely cumulative and not for the purpose of impeachment. *New Amsterdam Casualty Company v. Jordan*, 359 S.W.2d 864, 866 (Tex.1972). Generally, such motions are not looked upon with favor by the courts of Texas unless it appears that the new evidence would probably cause a different result if a new trial was granted. *Meehan v. Pickett*, 463 S.W.2d 481, 483 (Tex.Civ.App.—Beaumont 1971, writ ref'd n. r. e.); *Jacobi v. Texas State Board of Medical Examiners*, 308 S.W.2d 261, 265 (Tex.Civ.App.—Waco 1957, writ ref'd n. r. e.).

Mr. Eckert's new evidence does not meet these requirements. The evidence is cumulative. It is the same type of evidence regarding the same issue (*i. e.*, the amount of time Dr. Smith spent with Mrs. Eckert on the morning of February 23rd) as offered by the plaintiffs throughout the trial. The only practical effect of the evidence would be to impeach Dr. Smith by showing he was mistaken about the number of patients he saw on February 23rd and the amount of time he spent with Mrs. Eckert. The parties stipulated that Dr. Smith would testify upon examination of Judi Penny's hospital record that he only saw her for a minute or two before 10:50 a. m., 23 February 1975. This stipulation coupled with the absence of any proof by the plaintiffs that Dr. Smith spent an inordinate amount of time with Judi Penny makes it highly unlikely that the new evidence would probably cause a different result in a new trial. The new evidence does not bring to light a new and independent truth which is so decisive as to show that justice has not been attained or that the trial court abused its discretion by overruling the motion. *New Amsterdam Casualty Company v. Jordan, supra*, at 867–68. We overrule Mr. Eckert's contention that the trial court committed reversible error by refusing to grant him a new trial on the newly discovered evidence grounds.

In summary, we overrule Mr. Eckert's five points of error. Accordingly, the judgment of the trial court is affirmed.

COUNTISS, J., not participating.