**Carol HENDERSON, Appellant,**

v.

**HEYER–SCHULTE CORPORATION OF SANTA BARBARA et al., Appellees.**

**No. 17627.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

March 27, 1980.

Rehearing Denied May 15, 1980.

Kronzer, Abraham & Watkins, W. W. Watkins, Houston, for appellant.

Funderburk & Funderburk, Weldon Funderburk, Andrews, Kurth, Campbell & Jones, Sam W. Cruse, Jr., Houston, for appellees.

Before PEDEN, EVANS and WALLACE, JJ.

PEDEN, Justice.

Carol Henderson appeals from a take-nothing judgment in a medical malpractice suit. She complains of 1) an instruction in the trial court's charge regarding the standard of care required of doctors in selecting surgical procedures and 2) the trial court's exclusion of certain evidence which she offered to impeach the testimony of the defendant's principal expert witness. We affirm.

Defendant-appellee Dr. Philip Rothenberg is a specialist in plastic surgery who has practiced in Houston since 1973. In

September of 1974, Dr. Rothenberg performed a mammary augmentation operation on Mrs. Henderson, inserting artificial breast implants manufactured by Heyer-Schulte Corporation. The implants consisted of silicone envelopes filled with a soft silicone gel. After inserting each implant, Dr. Rothenberg intentionally slit the envelope to allow the gel to escape into the retro-mammary pockets.

Several days after the surgery, Mrs. Henderson began experiencing swelling, soreness, and inflammation of her breasts. She returned to Dr. Rothenberg, who examined her and diagnosed a hematoma (collection of blood) behind her left breast. She was hospitalized immediately, and Dr. Rothenberg removed the implant from her left breast, drained the hematoma, inserted a new Heyer-Schulte implant, and again ruptured the envelope.

While Mrs. Henderson continued seeing Dr. Rothenberg for post-operative care until early December, she continued to experience pain and inflammation. She later developed numerous small lumps or nodules under the skin of her chest and abdomen; these were later diagnosed as siliconomas, caused by accumulations of migrating silicone gel. The testimony is in dispute as to whether the siliconomas arose after other doctors had operated on her. Although she has undergone over twenty surgical operations to remove the siliconomas, they continue to appear. In addition, Mrs. Henderson has suffered several deformities in the shape and placement of her breasts. She has consulted many other physicians and has undergone subsequent augmentation procedures, some of which were sought to further increase the size of her breasts.

Mrs. Henderson sued both Dr. Rothenberg and Heyer-Schulte Corporation, alleging that Dr. Rothenberg was negligent in his care and treatment of her and that Heyer-Schulte was guilty of both negligence and breach of warranty in manufacturing a defective product. The defendants sued each other for indemnity or contribution. Prior to the trial, Heyer-Schulte settled with Mrs. Henderson, but it remained in the suit because of the doctor's cross-action. The case was tried before a jury and a take-nothing judgment was rendered.

The evidence established that the surgical technique or procedure followed by Dr. Rothenberg in this case was taught to him at Baylor College of Medicine and was utilized by various qualified and respected plastic surgeons in the Houston area at one time. It is also uncontroverted that the use of such technique is no longer recognized or accepted. The heart of the controversy in this case was submitted to the jury in the first two special issues: was the defendant negligent in using that technique in September of 1974, and if so, was that negligence a proximate cause of damage to the plaintiff?

In answer to special issues, the jury 1) failed to find that Dr. Rothenberg had been negligent in intentionally slitting the envelopes containing the gel, so the jury did not answer 2) the proximate cause issue; the jury 3) found that Heyer-Schulte was negligent in failing to provide proper warnings and instructions about the use of its silicone implants; 4) found that such negligence was a proximate cause of Mrs. Henderson's injury; 5) found that Mrs. Henderson was negligent in failing to give an accurate medical history to the surgeon who performed her third augmentation; and 6) found that her negligence was also a proximate cause of her injury.[1] The jury did not answer the damage issues.

Mrs. Henderson first complains about an instruction given by the trial judge, saying it was not a correct statement of the law, was inconsistent with the proper standard of care required of physicians in choosing surgical procedures, was in conflict with the decision of the Texas Supreme Court in *Hood v. Phillips*, 554 S.W.2d 160 (1977), and

1. Dr. Rothenberg's view was that insertion of larger, heavier saline implants during a subsequent operation caused increased pressure in the retro-mammary pockets, causing the silicone to migrate, and that had the other surgeon known Mrs. Henderson's full medical history he would not have used such large implants. The jury apparently accepted this theory.

constituted a comment on the weight of the evidence to such an extent as to amount to a directed verdict. The instruction reads:

If you find from the credible evidence that other plastic surgeons recognized more than one method for performing augmentation mammoplasties at the time in question you are instructed that Dr. Rothenberg was at liberty to select any of such methods. A doctor is not negligent merely because he made a choice of a recognized alternative method for the procedures he followed in the treatment of a patient, if he exercised the required skill and care in administering and following the method of his choice. This would be true even though other medical witnesses may not agree with the choice he made.

The instruction immediately preceded this issue:

#### Special Issue No. 1

Do you find from a preponderance of the evidence that in connection with the surgeries performed by Dr. Rothenberg on Carol Henderson in September of 1974, the intentional "rupturing" of the prosthesis under the circumstances then and there existing was negligence?

Definition: By the term "negligence" as used in the above and foregoing issue, is meant the failure to exercise that degree of care that would have been exercised at the time of the "rupture" by a physician and surgeon with similar training and experience, practicing in Harris County, Texas, under the same or similar circumstances.

Mrs. Henderson made a timely objection to the instruction and later requested an amendment to the charge instructing the jury to disregard it.

We agree that the instruction should not have been given. The Supreme Court of Texas in *Hood v. Phillips*, supra, established the proper test for the standard of care in a medical malpractice case where the plaintiff attacks the surgical procedure selected and employed by the doctor. After discussing several tests which had been followed in

this and in other jurisdictions, the Court concluded:

We are of the opinion that the statement of the law most serviceable to this jurisdiction is as follows: A physician who undertakes a mode or form of treatment which a reasonable and prudent member of the medical profession would undertake under the same or similar circumstances shall not be subject to liability for harm caused thereby to the patient. The question which conveys to the jury the standard which should be applicable is as follows: Did the physician undertake a mode or form of treatment which a reasonable and prudent member of the medical profession would not undertake under the same or similar circumstances? 554 S.W.2d at 165.

The court expressly rejected standards which would release doctors from liability when a "respectable minority" or a "considerable number" of physicians adhere to the procedures in question. As Mrs. Henderson points out, the instruction given in this case does not even go that far in establishing a minimal threshold. It simply directs the jury to consider whether "other plastic surgeons" recognized the method used by Dr. Rothenberg. There is no requirement that the "other" surgeons be reasonable or prudent or that they be prepared to employ that method under circumstances similar to those Dr. Rothenberg faced, the two factors most stressed in *Hood*.

We do not agree with Dr. Rothenberg's position that the instruction given is supported by existing case law, *Forney v. Memorial Hospital*, 543 S.W.2d 705 (Tex.Civ. App.1976, writ ref. n.r.e.), in particular. In *Forney*, the plaintiff alleged on appeal, *inter alia*, that an instruction which was virtually identical to the instruction given in this case was improper and should not have been submitted. The Court of Civil Appeals affirmed the judgment of the trial court and found that the contested instruction was proper.

Dr. Rothenberg points out that the Texas Supreme Court denied an application for writ of error in *Forney* while it had the

*Hood* case under consideration and that the Court's opinion in *Hood* never expressly disapproves of the *Forney* instruction. Those circumstances, however, do not necessarily lead to the inference that the *Forney* instruction survives *Hood*. First, there were other reasons for which the Court could have upheld the decisions of the lower courts in *Forney*. Second, express disapproval is not required in order to invalidate a statement of law which is in clear conflict with a later pronouncement.

■ We must next determine whether the error in giving the instruction in question was harmless. Assuming that it caused the jury to answer Special Issue No. 1 in the negative, the error would be harmless if, as Dr. Rothenberg contends, the evidence was legally insufficient to support the submission of that issue or of Issue No. 2 on proximate cause.

Mrs. Henderson's only expert testimony on the standard of care came from Dr. Robert Reeder, who testified by deposition. Dr. Reeder received his medical education in Mississippi and in Memphis, Tennessee. He served his internship and residency in Memphis and in San Francisco and has practiced in Memphis since 1960. Dr. Reeder is obviously a highly qualified plastic surgeon, who is not licensed to practice medicine in Texas and has never practiced here. He testified that techniques for performing augmentation mammoplasties vary somewhat from surgeon to surgeon and that he is not familiar with what was being taught at Baylor College of Medicine in Houston from 1970 to 1974. Although he stated that his views regarding the propriety of rupturing the silicone envelopes would be the same whether he was practicing "in Houston, Texas, or Nome, Alaska, or Timbuktu," that is no indication that he knows what the prevailing standard in Houston is or was in 1974.

Dr. Reeder testified that he does not teach his students to rupture the envelopes, and that he knows of no surgeon in Memphis who does so. He indicated that in his opinion the rupture technique is "nonstandard." On cross-examination, however, he agreed that if Dr. Rothenberg had been taught to use that technique in his residency training in Houston, "that would not have been nonstandard in the Houston area, then . . . ."

We have noted that it is agreed that Dr. Rothenberg was in fact taught to use the rupture method during his residency training in Houston and that this was an accepted and standard practice in Houston at one time. Dr. Rothenberg testified that he stopped rupturing the implants in late 1974 or 1975, after Mrs. Henderson's operation. On cross-examination Dr. Rothenberg conceded that the doctors who have followed the rupture method have been in the minority from the beginning. However, that is not evidence that in 1974 in Houston a reasonable and prudent doctor would not have ruptured the envelope implanted in Mrs. Henderson.

Dr. Frank Gerow testified by deposition on behalf of Dr. Rothenberg. He was not shown to be an interested witness. Dr. Gerow is a professor of plastic surgery at Baylor College of Medicine in Houston, has been associated there since 1965, and has done considerable research and publication in the field of breast implants. He was one of Dr. Rothenberg's teachers when Dr. Rothenberg was in residency training. Dr. Gerow also testified that the method employed by Dr. Rothenberg in Mrs. Henderson's case was taught to him and was a standard and accepted procedure among plastic surgeons in Houston in 1974. He said there was nothing the defendant could have done to prevent the reaction the plaintiff had.

■ The question propounded to Dr. Reeder concerning the propriety of the rupture method was not directed to the standard of care in effect in 1974. In cases such as this, where it is undisputed that at one time the medical technique in question was accepted and it is equally undisputed that it is no longer used, it is particularly important to limit opinion testimony to the standard of care in effect when the operation in question was performed. *Guidry v. Phillips*, 580 S.W.2d 883 (Tex.Civ.App.1979, writ ref. n.r.e.).

Again, we note that the surgical technique used by Dr. Rothenberg in this case was taught to him in medical school and was used at one time by qualified and respected plastic surgeons in Houston but is no longer accepted or recognized. We look to the testimony on which the appellant must rely to show that she offered evidence sufficient in law to raise the first special issue—asking whether the defendant was negligent in intentionally rupturing the prosthesis in September, 1974—and its proximate cause issue.

We review the testimony of Dr. Gerow on cross-examination: The surgical technique of purposefully rupturing the envelope after it has been put in place is no longer used because the gels have changed. They now flow freely, but the gel used in 1974 was extremely cohesive and would stay as a gel mass within the pocket after extrusion from the implant. The manufacturers tried to present an implant that felt softer. Dr. Gerow did not use Heyer-Schulte implants as a common practice in 1974; he normally used a similar implant made by Dow Corning. To his knowledge, there were no differences between the implants produced by those two companies in 1974. The gel used today is softer and less cohesive than that used in 1974. He believes it was at some time in 1976, when the gels were changed, that the plastic surgeons in Houston quit rupturing the envelope in this kind of operation. He has, under unusual circumstances, "within the last couple of years" and "as late as 1979," deliberately ruptured an envelope previously inserted in a patient. He thinks this was done in his office. He has no records before him to show the date, but he believes the last time he deliberately ruptured an envelope in a hospital was in 1975 or 1976. He is basing his memory of the time on the appearance of directives in the various brochures published by the makers of the implants. He had something to do with the directive appearing in one of the brochures, and he would know "by the timing of that brochure" approximately when he last performed a deliberate surgical rupture of an implant in a hospital. He was talking about brochures that accompanied the implants of such people as Heyer-Schulte and Dow Corning.

We review the deposition testimony of Mr. James A. Rudy, a witness called by the plaintiff: He has been president of Heyer-Schulte Corp. of Santa Barbara, California, since February, 1975. Prior to that he was with Edwards Laboratories, a producer of cardiovascular medical devices. Heyer-Schulte does not make the gel it puts into its implants. The five companies making implants today use gels of about the same viscosity or consistency. Dow Corning initially had an implant of firmer consistency, but he believes it was some time in the 1973–1974 period that Dow Corning changed its design to one more like those of the other manufacturers. It is difficult to say whether there has been any change since 1970 in the consistency of the product made by Heyer-Schulte; he thinks there has been a slight change toward a harder gel, and some of the change has taken place since September of 1974. There would be very little difference between the consistency of the gel used by Heyer-Schulte in early 1974 and that used today. His company now performs a "sag test," required as to each batch since early 1975, by holding an implant by its top, cutting a one-inch hole in its bottom, and observing how much gel will come out. The results since early 1974 "might have changed from perhaps six inches to two inches, either of which would define pretty tight gel." In September of 1974 the consistency of the Heyer-Schulte product was the same or almost the same as that of the other companies making a similar product.

We conclude that the evidence was legally insufficient to raise Special Issues 1 and 2. Dr. Gerow recalled that *he* last used the surgical technique in question in a hospital at approximately the time directives appeared in the various brochures. The evidence is legally insufficient to show that before September of 1974, the gels had been changed to be less cohesive, directives had been issued by the implant makers warning against use of the technique in question, and the reasonable and prudent plastic sur-

geons in Houston had ceased to undertake it under the same or similar circumstances.

This brings us to the closely-related matter raised by the appellant's third point of error. In it she complains that the trial court erred in refusing to admit Plaintiff's Exhibit 6, which she describes as a bulletin published in 1973 by the Dow Corning Corporation and sent to physicians along with Dow Corning breast implants. She contends that the bulletin was admissible to show the state of medical knowledge in 1974 and to impeach certain testimony of Dr. Gerow and Dr. Rothenberg by showing that it was in 1973 that the gels in the implants were changed and doctors ceased to rupture the envelopes because the new gel would be more likely to migrate and cause siliconomas.

At the trial Mrs. Henderson was unable to produce any witness who had ever seen the exhibit. She called Mr. Tom Tam, an employee of a medical supply house which distributes Dow Corning products, in an attempt to properly identify and authenticate the bulletin. He said he recognized it as the type of instruction sheet that accompanied Dow Corning breast prostheses. It bears the date of October, 1973. He said he is familiar with the "Notice Important Information" printed on the back of the brochure and with another (unidentified) caption because they appear on Dow Corning's current literature. However, Mr. Tam was not employed by the supply company in 1973 or 1974, had never seen Plaintiff's Exhibit 6 before, and did not know when, if ever, it was published or circulated. The most Mr. Tam was able to say was that the bulletin is "the type" of information distributed by Dow Corning today.

■ It was not established that Plaintiff's Exhibit 6 was available to or distributed to doctors in Houston or any other community in 1973 or 1974, that it was customarily included in shipments of Dow Corning implants at that time, or that it was even a document printed by Dow Corning. Without such identification or authentication, its exclusion was not error. See 1 McCormick and Ray, Texas Law of Evi-

dence § 21; *Gallegos v. Gulf Coast Investment Corporation*, 483 S.W.2d 944 (Tex.Civ.App.1972), dism'd as moot Tex., 491 S.W.2d 659 (Tex.1973); *Zodiac Corporation v. General Electric Credit Corporation*, 566 S.W.2d 341 (Tex.Civ.App.1978, no writ); *American National Insurance Company v. Tri-Cities Construction, Inc.*, 551 S.W.2d 106 (Tex.Civ.App.1977, no writ). Point of error three is overruled.

We do not reach Dr. Rothenberg's third cross-point.

The judgment is affirmed.